John CATHEY, Appellant,

v.

Larry MEYER and John Glover, Appellees.

No. 10–99–326–CV.

Court of Appeals of Texas, Waco.

Aug. 4, 2003.

Rehearing Overruled Sept. 19, 2003.

Greg White, McGregor & White, Dale Williams, Jim Wren, Williams, Squires & Wren, Waco, Gary L. Richardson, Tulsa, for Appellant.

Corbet F. Bryant, Jeffrey S. Levinger, Monica Wiseman Latin, Stephanie M. Dooley, Carrington, Coleman, Sloman & Blumenthal, Dallas, for Appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

This cause involves allegations of fraud and breach of fiduciary duty between business associates.

## I. FACTUAL BACKGROUND

In the mid–1990's, Larry Meyer was in the real estate development business. His projects included the acquisition, management, development, and sale of investment properties. To fund these projects, Meyer borrowed the initial investment money from a lending source called C.I.O.S. Meyer's income derived, at least in part, from profits on the projects [1] and from consulting fees from the numerous limited partnerships he set up to carry out the projects.

In the fall of 1992, Meyer and John Cathey formed a business relationship. It was Cathey's job to find projects in which Meyer could invest and to help plan the financing, construction, and operation of the projects. Over the years, Cathey and Meyer entered into a series of agreements, both oral and written, on various projects. Cathey was paid a base salary, but he alleged his primary benefit was to be income derived in various ways from net profits from the projects on which he worked. From September 1992 to August 1996, Cathey was involved in dozens of projects with Meyer. Pertinent to the lawsuit which is the subject of this appeal, they were involved in the following:

- 1993: The acquisition of the Silverado Apartments, for which there was a written distribution agreement that Cathey would be paid twenty percent of net profits.
- 1993: The acquisition of the Polo Club Apartments, for which there was a written distribution agreement that Cathey would be paid five percent of net profits.
- 1995: The acquisition of the Valley Ranch Apartments, for which there was a written distribution agreement that Cathey would be paid nine per-

cent of net profits if the distribution occurred before Meyer and Cathey terminated their business relationship, and four and one-half percent after termination.

- 1995: The acquisition of the Arbors Apartments. Cathey and Meyer were the sole partners in a limited partnership which purchased these apartments from Meyer's father. Cathey's interest in the partnership was five percent.
- 1995: The refinancing of the Silverado Apartments and the Arbors Apartments.
- June 1995 through August 1996: The development of a project in Waco to construct a movie theater complex, and a project in Dallas to construct luxury condominiums.

John Glover, an attorney, was also involved in the projects, drafting the legal documents for the limited partnerships and corporations through which the projects were carried out, as well as the written agreements which defined Cathey's financial interests. Cathey was an officer, manager, or partner in many of these business entities, but he claimed he was not privy to the financial records. At trial, Meyer stated that Cathey simply never asked to review the records.

During the three years and eleven months of his dealings with Meyer, Cathey was paid about $260,000. But the two had periodic disagreements about what Cathey's financial interests were. First, Cathey claimed at trial that by January 1993, just four months into their relationship, Meyer had promised that Cathey would make twenty percent of the net profits from projects Cathey found, and ten per-

---

1. Profits came from various sources, such as apartment leases and the income realized on sales of properties for amounts greater than invested costs.

cent from projects he did not find but nevertheless worked on. He was also to receive a $25,000 bonus if he completed a refinancing of the loans on a property previously purchased. He claimed that this oral "global agreement" as well as other oral promises were not always fully honored. However, there was trial testimony from Meyer's witnesses that the "global agreement," if it existed, would not have pertained to larger projects or to projects involving outside partners. Cathey also complained that a number of times Meyer either (a) refused to put in writing the oral agreement they had reached on a particular project or (b) presented Cathey with a written agreement containing provisions different from what had been agreed. Also, Cathey claimed to have suffered because many of the projects, after expenses and overhead were deducted, never made any net profit. He claimed at trial that Meyer secretly paid himself large "consulting fees" thereby draining off any net profit and enriching himself in the process.

In August 1996, Meyer presented Cathey with four documents and demanded he sign them. One was a general release of any interests Cathey might have in any of the projects he had been involved with. A second cut Cathey's interest in one of the apartment complexes in half. The third was an acknowledgment that Cathey was Meyer's employee, which Meyer said he needed for tax purposes. It also contained provisions dramatically cutting Cathey's monthly salary and binding Cathey to a non-competition agreement. The fourth provided that Cathey would get five percent of net profits from the Dallas condominium project. Cathey claimed that Meyer demanded that he sign all four

documents, or he would get no interest in the Dallas project. Cathey refused to sign any of the documents. Meyer had the locks changed on Cathey's office, and their relationship ended.

## II. TRIAL COURT PROCEEDINGS

On May 22, 1997, Cathey sued Meyer for fraudulently inducing Cathey into: (1) entering into written agreements regarding his compensation for work done on purchasing four apartment complexes, by not disclosing that Meyer intended to pay himself large consulting fees, which had the effect of draining off the profits from the apartment projects so that there were no net profits from which Cathey's share could derive; (2) working on the refinancing of two of the four apartment complexes, when Meyer did not intend to pay Cathey to the full extent orally promised; and (3) working on the Waco and Dallas projects, when Meyer did not intend to pay Cathey to the full extent orally promised. Cathey also sued Meyer for breach of fiduciary duty on the Waco and Dallas projects, asserting that Meyer took advantage of him by not fairly compensating him as promised.[2]

Cathey sued Glover, the attorney, for breach of fiduciary duty on the Dallas project by not protecting Cathey's interests in his dealings with Meyer, and for negligence on the Dallas project by not expressly telling Cathey that Glover was representing only Meyer's interests and that Cathey should seek other counsel. Cathey also alleged that Glover conspired with Meyer to fraudulently keep Cathey in the business relationship.[3]

---

2. Cathey also filed a claim for breach of contract, which was later abandoned, and a claim for quantum meruit on which the trial court granted a directed verdict.

3. Cathey's dispute with Glover was resolved while the appeal has been pending, and on Cathey's motion we dismissed as to Glover.

## A. The Verdict

After a six-week trial in July 1999, the jury returned its verdict on twenty-seven questions. Regarding the claims against Meyer, it found:

- Meyer fraudulently induced Cathey into written agreements on the four apartment complex projects. This fraud proximately caused $37,500 in damages.[4]

- Meyer fraudulently induced Cathey to provide services in connection with the refinancing of two of the four apartment complexes. This fraud proximately caused $35,000 in damages.[5]

- Meyer fraudulently induced Cathey to provide services regarding the Waco movie theater and Dallas condominium projects. This fraud proximately caused $150,000 in damages for the Waco project and $750,000 in damages for the Dallas project. $2,250,000 should be assessed against Meyer in exemplary damages for this fraud.

- Cathey ratified and waived Meyer's fraud that the jury found in all the above projects.

- There was a relationship of trust and confidence between Meyer and Cathey (i.e., Meyer had a fiduciary duty to Cathey) which existed prior to and apart from the Waco and Dallas projects, which relationship ended on August 13, 1996.

- Meyer breached his fiduciary duty to Cathey regarding the Waco and Dallas projects. This breach proximately caused $150,000 in damages for the

Waco project and $750,000 in damages for the Dallas project.

- Cathey knew or should have known on or before May 22, 1995, of the facts underlying Meyer's breach of fiduciary duty. (The lawsuit was filed on May 22, 1997.)

## B. Post–Verdict Motions and Orders

All the parties filed post-verdict motions. Cathey filed a "Motion to Disregard Certain Jury Findings and Motion for Judgment."[6] Cathey asserted there was "no support in the evidence" for the jury's findings that (a) Cathey ratified and waived fraud by Meyer and (b) Cathey knew or should have known about the facts giving rise to the breach of fiduciary duty claim over two years before filing suit. Specifically, he argued the following:

1. Ratification only bars a remedy of rescission in a breach-of-contract action, not damages in a fraud action.

2. Under the definition of ratification in the charge, the person defrauded must either (a) continue to accept some benefits after learning of the fraud, or (b) conduct himself so as to recognize the agreement as binding. Because Cathey received no benefits from and there was no consummated agreement on the Waco and Dallas projects, by definition he cannot have ratified fraud related to those two projects.

3. The question on ratification was improper because the jury was not asked if Cathey had full knowledge of the fraud, which, he asserted, is required for ratification.

---

**4.** Silverado Apartments—$10,000; Polo Club Apartments—$12,000; Valley Ranch Apartments—$11,500; Arbors Apartments—$4,000.

**5.** Silverado Apartments—$25,000; Arbors Apartments—$10,000.

**6.** Cathey's motion for judgment requested that the trial court award $972,500 plus interest against Meyer for compensatory damages, $1,945,000 plus interest against Meyer for exemplary damages, and $150,000 plus interest against Glover for compensatory damages.

4. There was no evidence Cathey intentionally surrendered any right to the full benefit of his bargains with Meyer, which the instruction on waiver required the jury to find.

5. Waiver typically is asserted by a plaintiff in a breach-of-contract action when the defendant pleads the affirmative defense of fraud. It is not applicable here.

6. Based on the instructions to the jury on waiver, Cathey cannot have waived a known right regarding the Waco and Dallas projects because no agreement was ever consummated which would have established the right.

7. As with ratification, waiver only applies to the remedy of rescission in a breach-of-contract action, not to damages for fraud.

8. Cathey could not have known of Meyer's breach of fiduciary duty regarding the Waco and Dallas projects on or before May 22, 1995, because those projects did not exist prior to June 1995.

Meyer filed a thirty-five-page "Motion for Judgment Notwithstanding the Verdict and to Disregard Jury Findings and, in the Alternative, Motion for Judgment on the Verdict," with 453 pages of attachments. He asserted: (a) there was legally insufficient evidence to support the fraud and breach-of-fiduciary-duty claims against Meyer; (b) even if there was legally sufficient evidence, recovery on the fraud claims is barred by the findings of ratification and waiver, and recovery on the breach-of-fiduciary-duty claim is barred by limitations; and (c) there was no evidence of proximate cause regarding the Dallas project, because any fiduciary duty Meyer had to Cathey ended in 1996, long before the property was foreclosed in 1998 result-

ing in no profits. Specifically, he argued the following:

1. Regarding fraud and the written agreements pertaining to four apartment complexes, there was no evidence that when Meyer entered into the agreements, he intended to later reduce the profits through consulting fees. Therefore there was no material false misrepresentation.

2. The jury did not find that Cathey knew or should have known on or before May 22, 1993, of the facts underlying Meyer's fraudulent acts. However, that finding should be disregarded because Cathey's testimony conclusively established that the "global agreement" was formed in January 1993. And if the statute of limitations for fraud is four years, then because the lawsuit was filed on May 22, 1997, the fraud claims regarding the four apartment complexes are barred by limitations, because Cathey knew before May 22, 1993, that the "global agreement" was not being honored.

3. The evidence was legally insufficient to prove that Cathey's damages (underpayments) under the four written agreements were proximately caused by any fraudulent inducement by Meyer at the time the agreements were entered into.

4. The evidence proved as a matter of law that Cathey was fully compensated for the Silverado Apartments, Polo Club Apartments, and Valley Ranch Apartments projects.

5. There was no evidence of damages for the Arbors Apartments project, because Cathey was to be compensated as a limited partner, not under a distribution-of-profits agreement.

6. As to the refinancing of the Silverado Apartments and Arbors Apartments: (a) the evidence proved as a matter of law that Cathey was not entitled to a bonus for his services; (b) there was no evidence that when the agreement for Cathey's services was entered into, Meyer intended not to pay Cathey according to the agreement; (c) there is no evidence Cathey relied on a promise of a bonus when he performed services for refinancing; and (d) the evidence proved as a matter of law that there was no money left after closing from which a bonus could have been paid, and therefore Cathey failed to prove damages.

7. There was no evidence Cathey was entitled to compensation for work on the Waco and Dallas projects in addition to his salary, and therefore there was no evidence of damages for these projects.

8. There was no evidence that at the time of the formation of the agreements on the Waco and Dallas projects, Meyer intended not to pay Cathey.

9. Cathey's fraud claims derive from the "global agreement" in 1993. Because the fraud claims are premised on a contract (the "global agreement") that could not be performed in one year, the statute of frauds applies. Therefore, because there was no written agreement on the Waco and Dallas projects, the fraud claims pertaining to them fail.

10. The damages question for fraud pertaining to the Waco and Dallas projects asked about benefit-of-the-bargain damages. However, the liability question for fraud asked whether Meyer fraudulently induced Cathey to provide services for which he was not fully compensated. Therefore, the damages question should have asked about the value of those services, not benefit-of-the-bargain damages. Because it did not, the proper measure of damages was not used, and damages are not recoverable.

11. Cathey's damages for fraud on the Dallas project were derived from a twenty-percent interest in any profits distributed by the limited partnership which developed that project. Because the Dallas project was foreclosed on, the partnership never made any profit, and therefore as a matter of law Cathey has not proved his entitlement to any damages.

12. The evidence is legally insufficient that Meyer had an informal fiduciary duty to Cathey.

13. Cathey's damages for breach of fiduciary duty on the Dallas project were derived from a twenty-percent interest in any profits distributed by the limited partnership which developed that project. Because the Dallas project was foreclosed on, the partnership never made any profit. In addition, the jury found that the fiduciary relationship ended on August 13, 1996, long before the property was foreclosed on. Therefore as a matter of law Cathey has not proved his entitlement to any damages.

14. There is no clear and convincing evidence that Meyer defrauded Cathey on the Waco and Dallas projects, and therefore exemplary damages are not recoverable. Also, exemplary damages are

capped under the Civil Practice and Remedies Code.

15. The jury's findings of ratification and waiver on all the fraud claims entitled Meyer to a take-nothing judgment on the verdict against Cathey.

16. The jury's finding on limitations, *i.e.*, that Cathey knew or should have known of the facts underlying the breach of fiduciary duty two years or more before the date the lawsuit was filed, entitles Meyer to a take-nothing judgment on the verdict against Cathey.

■ The trial court granted Meyer's motion and denied Cathey's motion. The trial court signed a take-nothing judgment in favor of Meyer without specifying on what grounds it was based. We sustain the judgment of a trial court if it is correct on any theory of law applicable to the case and supported by the record, regardless of whether the trial court gives the correct legal reason for the judgment, or whether it gives any reason at all. *See Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73, 84 (1939).

### C. Post–Judgment Motions

Cathey filed a motion for new trial claiming, *inter alia*, factually insufficient evidence to support the jury's findings of ratification and waiver.[7] The motion also reiterated his objections to the charge on ratification and waiver, *i.e.*, that the defenses do not apply when damages are sought in a claim for fraud and that the definitions in the jury instructions were erroneous. Cathey also filed a motion to modify, correct, or reform the judgment. This motion addressed the proper limitations period for breach of fiduciary duty and urged the court to render judgment on

that claim for Cathey. These motions were overruled by operation of law.

Meyer did not file a motion for new trial.

Several weeks after judgment, Meyer filed a motion for sanctions claiming that Cathey lied in a deposition and in responses to requests for admissions to inquiries about his background and credentials, and Meyer had to expend thousands of dollars discovering the true facts so he could present them at trial. The trial court granted the motion and awarded close to $26,000 as sanctions.

### III. ISSUES ON APPEAL

Cathey appeals on five issues as to Meyer:

1. The trial court erred in rendering a take-nothing judgment in favor of Meyer because: (a) there was more than a scintilla of evidence to support the jury's findings regarding Cathey's fraud and breach of fiduciary duty claims against Meyer; (b) the jury's finding that Cathey did not know of the fraud more than four years before the lawsuit was filed should not have been disregarded; (c) the statute of frauds does not bar recovery for the fraud claims pertaining to the four projects which were not in writing, because Cathey did not seek recovery for breach of contract; and (d) the foreclosure on the Dallas project does not preclude the recovery of damages.

2. The trial court erred in finding that "ratification" barred recovery on all the fraud claims against Meyer because: (a) there was no evidence that Cathey ratified Meyer's fraudulent acts; (b) the definition of ratification in the charge "essentially de-

---

7. These complaints are not presented on appeal.

fines [the Waco and Dallas projects] out of the ratification defense," because an agreement on Cathey's benefits was never consummated between him and Meyer; and (c) ratification is inapplicable in this case, because normally it applies only when the remedy of rescission of a contract is sought, and it does not apply when, as here, a party merely continues to honor the terms of a contract after he learns he was fraudulently induced to enter into it.

3. Under the facts of this case, there is no difference in the affirmative defenses of "ratification" and "waiver." Therefore, for the same reasons that apply to "ratification," the trial court erred in finding that "waiver" barred recovery on all the fraud claims against Meyer.

4. The trial court erred in finding that limitations bars the recovery against Meyer for breach of fiduciary duty, because a four-year rather than a two-year limitations period applies. Even if the period was two years, the evidence is undisputed that the Waco and Dallas projects did not commence until after the two-year period began.

5. The trial court abused its discretion in awarding sanctions for discovery abuse.

Meyer asserts as cross-issues: (1) the evidence is legally and factually insufficient to support the jury's findings in Cathey's favor, and (2) the trial court erred in its instructions to the jury regarding the breach-of-fiduciary-duty question.

## IV. FRAUD CLAIMS

Cathey presents three issues, two with multiple sub-parts, concerning his fraud claims against Meyer. Each advances a reason why the trial court erred in granting Meyer's post-trial motions. Because Cathey's issues on ratification and waiver, if overruled, would bar recovery as to all or part of the fraud claims, we will discuss those issues first. Next, his issue concerning the statute of frauds, which relates to only the Waco and Dallas projects, will be discussed. Then, his issues concerning the legal sufficiency of the evidence, *i.e.*, that the court erred if it granted the take-nothing judgment on the basis that there was no evidence to support the jury's findings in Cathey's favor, will be discussed. Finally, we will discuss his argument about exemplary damages.

■ Meyer's cross-issues that the evidence supporting the jury's findings favorable to Cathey is legally and factually insufficient occupy one sentence in his fifty-nine-page brief. There are no citations to the reporter's record. Because the trial court had to find that no evidence supports the jury's findings in Cathey's favor before it could disregard those findings (if that was the basis for the judgment), Meyer's cross-issues on legal sufficiency are, of necessity, resolved by our discussion of Cathey's issues on legal sufficiency. However, Meyer has failed to brief his cross-issues on factual insufficiency. The rules of appellate procedure require that "[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to authority and to the record." Tex.R.App. P. 38.1(h), 38.2(a)(1). This is especially important in a case such as this with a reporter's record consisting of many thousands of pages covering a six-week trial. By his failure, Meyer has waived the cross-issues on factual sufficiency. *E.g. Franklin v. Enserch, Inc.*, 961 S.W.2d 704, 711 (Tex.App.-Amarillo 1998, no pet.); *Sisters of Charity of the Incarnate Word v. Gobert*, 992 S.W.2d 25, 31 (Tex.App.-Houston [1st Dist.] 1997, no pet.); *Leyva v.*

summer of 1996, when his relationship with Meyer abruptly ended.

■ Again, ratification and waiver require some voluntary action *after* discovery of the fraud which either relinquishes a right or validates the fraud. The evidence conclusively shows that Cathey performed services on these four projects before he realized Meyer did not intend to fully honor his promises about compensation, *i.e.,* before Cathey learned of the fraud. *Juliette Fowler,* 793 S.W.2d at 666 n. 9. After he learned of it, the evidence does not show specific acts of relinquishment or validation. Although there is evidence that, during the course of his numerous business dealings with Meyer over the years, Cathey knew he had not gotten the full benefit of some of his bargains with Meyer in the past, this does not establish that, during the course of the projects, Cathey became aware of Meyer's fraud and then performed acts of ratification or waiver.

The evidence shows that, regarding these four different projects, Cathey was made promises of financial rewards in exchange for services, he performed services, and the full measure of the rewards promised was not given. In each instance, the jury found that fraud had occurred. We find no more than a scintilla of evidence that Cathey intentionally relinquished his rights under these four agreements or intentionally validated the fraud. *Id.* Therefore, there is legally insufficient evidence to support the jury's findings of ratification and waiver regarding these four projects.

### 6. Conclusion

There is legally insufficient evidence of ratification and waiver regarding any of

the eight fraud claims. The trial court erred if it rendered a take-nothing judgment based on these affirmative defenses.

### B. Statute of Frauds

■ Meyer argued in his post-trial motion that because Cathey's fraud claims derive from the "global agreement" in 1993, a contract that could not be performed in one year, the statute of frauds applies. He says because there was no written agreement on the Waco and Dallas projects which were begun in 1995, the fraud claims pertaining to them must fail.[9] Meyer attempts to characterize the agreements Cathey claimed he had with Meyer on the Waco and Dallas projects as dating back to 1993 when the "global agreement" was formed. He asserts that because the "global agreement" was *not intended to be* performed in one year, Cathey's fraud claims fail under the statute of frauds. TEX. BUS. & COM.CODE ANN. § 26.01(b)(6) (Vernon 2002); *Haase v. Glazner,* 62 S.W.3d 795, 799 (Tex.2001) (Benefit-of-the-bargain damages under a claim of fraudulent inducement into a contract are not recoverable if a claim of breach of the contract would fail under the statute of frauds.).

But the Waco and Dallas projects were not begun until 1995. There was evidence that the two agreements were "new" agreements, although some of their terms regarding Cathey's compensation may have derived from the "global agreement." In addition, the evidence does not establish that either project could not be performed in one year, and there was no jury finding on the issue. Therefore, there is legally insufficient evidence to support application of the statute of frauds, and the trial court

---

9. The statute of frauds is an affirmative defense which must be pled and proved by the defendant. TEX.R. CIV. P. 94.

erred if it rendered a take-nothing judgment based on this affirmative defense.

## C. Legal Sufficiency of the Evidence for the Fraud Claims; Jury Charge Issue

Cathey asserts on appeal that there was some evidence to support the jury's findings of fraud regarding each of the eight projects, and therefore the trial court erred in granting Meyer's motion for judgment notwithstanding the verdict or to disregard jury findings, if that was the basis for the judgment.

### 1. Standard of Review

We review the granting of a motion for judgment notwithstanding the verdict or a motion to disregard a jury finding in the light most favorable to the finding, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor. *Navarette v. Temple Independent Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987). We review for whether there is more than a mere scintilla of evidence to support the jury's finding. *Basin Operating Co. v. Valley Steel Products*, 620 S.W.2d 773, 776 (Tex.Civ.App.-Dallas 1981, writ ref'd n.r.e.); *see Farias v. Laredo Nat'l Bank*, 985 S.W.2d 465, 470 (Tex.App.-San Antonio 1997, no writ); *Quinn*, 726 S.W.2d at 19. "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499.

### 2. Four Written Agreements

■ First, Meyer's post-trial motion argued that the evidence proved as a matter of law that Cathey knew prior to the execution of the four written agreements that Meyer was not going to honor the "global agreement." This argument misses the point, because the fraudulent misrepresentation Cathey undertook to prove is the non-disclosure by Meyer about the consulting fees which affected the net profits under the four written agreements.

■ Next, Meyer argued there was no evidence that when he entered into these four agreements, he intended to later divert profits through consulting fees. "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986) (citations omitted). " 'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* (citing *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex.Civ.App.-El Paso 1951) (orig.proceeding)); *see Johnson & Higgins of Texas v. Kenneco Energy*, 962 S.W.2d 507, 527 (Tex.1998). There is evidence that, without telling Cathey, Meyer paid himself consulting fees which had the effect of denying Cathey income derived from profits from the apartment complexes. Construing the evidence in the light most favorable to Cathey, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor, we find that there was more than a scintilla of evidence from which the jury could have concluded that, at the time he entered into the four written agreements, Meyer intended to reduce or eliminate the profits by payment to himself of consulting fees. *Navarette*, 706 S.W.2d at 309.

■ Continuing to address proof of the elements of fraud, Meyer asserted in his post-trial motion that the evidence was

4. There was no evidence Cathey intentionally surrendered any right to the full benefit of his bargains with Meyer, which the instruction on waiver required the jury to find.

5. Waiver typically is asserted by a plaintiff in a breach-of-contract action when the defendant pleads the affirmative defense of fraud. It is not applicable here.

6. Based on the instructions to the jury on waiver, Cathey cannot have waived a known right regarding the Waco and Dallas projects because no agreement was ever consummated which would have established the right.

7. As with ratification, waiver only applies to the remedy of rescission in a breach-of-contract action, not to damages for fraud.

8. Cathey could not have known of Meyer's breach of fiduciary duty regarding the Waco and Dallas projects on or before May 22, 1995, because those projects did not exist prior to June 1995.

Meyer filed a thirty-five-page "Motion for Judgment Notwithstanding the Verdict and to Disregard Jury Findings and, in the Alternative, Motion for Judgment on the Verdict," with 453 pages of attachments. He asserted: (a) there was legally insufficient evidence to support the fraud and breach-of-fiduciary-duty claims against Meyer; (b) even if there was legally sufficient evidence, recovery on the fraud claims is barred by the findings of ratification and waiver, and recovery on the breach-of-fiduciary-duty claim is barred by limitations; and (c) there was no evidence of proximate cause regarding the Dallas project, because any fiduciary duty Meyer had to Cathey ended in 1996, long before the property was foreclosed in 1998 resulting in no profits. Specifically, he argued the following:

1. Regarding fraud and the written agreements pertaining to four apartment complexes, there was no evidence that when Meyer entered into the agreements, he intended to later reduce the profits through consulting fees. Therefore there was no material false misrepresentation.

2. The jury did not find that Cathey knew or should have known on or before May 22, 1993, of the facts underlying Meyer's fraudulent acts. However, that finding should be disregarded because Cathey's testimony conclusively established that the "global agreement" was formed in January 1993. And if the statute of limitations for fraud is four years, then because the lawsuit was filed on May 22, 1997, the fraud claims regarding the four apartment complexes are barred by limitations, because Cathey knew before May 22, 1993, that the "global agreement" was not being honored.

3. The evidence was legally insufficient to prove that Cathey's damages (underpayments) under the four written agreements were proximately caused by any fraudulent inducement by Meyer at the time the agreements were entered into.

4. The evidence proved as a matter of law that Cathey was fully compensated for the Silverado Apartments, Polo Club Apartments, and Valley Ranch Apartments projects.

5. There was no evidence of damages for the Arbors Apartments project, because Cathey was to be compensated as a limited partner, not under a distribution-of-profits agreement.

6. As to the refinancing of the Silverado Apartments and Arbors Apartments: (a) the evidence proved as a matter of law that Cathey was not entitled to a bonus for his services; (b) there was no evidence that when the agreement for Cathey's services was entered into, Meyer intended not to pay Cathey according to the agreement; (c) there is no evidence Cathey relied on a promise of a bonus when he performed services for refinancing; and (d) the evidence proved as a matter of law that there was no money left after closing from which a bonus could have been paid, and therefore Cathey failed to prove damages.

7. There was no evidence Cathey was entitled to compensation for work on the Waco and Dallas projects in addition to his salary, and therefore there was no evidence of damages for these projects.

8. There was no evidence that at the time of the formation of the agreements on the Waco and Dallas projects, Meyer intended not to pay Cathey.

9. Cathey's fraud claims derive from the "global agreement" in 1993. Because the fraud claims are premised on a contract (the "global agreement") that could not be performed in one year, the statute of frauds applies. Therefore, because there was no written agreement on the Waco and Dallas projects, the fraud claims pertaining to them fail.

10. The damages question for fraud pertaining to the Waco and Dallas projects asked about benefit-of-the-bargain damages. However, the liability question for fraud asked whether Meyer fraudulently induced Cathey to provide services for which he was not fully compensated. Therefore, the damages question should have asked about the value of those services, not benefit-of-the-bargain damages. Because it did not, the proper measure of damages was not used, and damages are not recoverable.

11. Cathey's damages for fraud on the Dallas project were derived from a twenty-percent interest in any profits distributed by the limited partnership which developed that project. Because the Dallas project was foreclosed on, the partnership never made any profit, and therefore as a matter of law Cathey has not proved his entitlement to any damages.

12. The evidence is legally insufficient that Meyer had an informal fiduciary duty to Cathey.

13. Cathey's damages for breach of fiduciary duty on the Dallas project were derived from a twenty-percent interest in any profits distributed by the limited partnership which developed that project. Because the Dallas project was foreclosed on, the partnership never made any profit. In addition, the jury found that the fiduciary relationship ended on August 13, 1996, long before the property was foreclosed on. Therefore as a matter of law Cathey has not proved his entitlement to any damages.

14. There is no clear and convincing evidence that Meyer defrauded Cathey on the Waco and Dallas projects, and therefore exemplary damages are not recoverable. Also, exemplary damages are

capped under the Civil Practice and Remedies Code.

15. The jury's findings of ratification and waiver on all the fraud claims entitled Meyer to a take-nothing judgment on the verdict against Cathey.

16. The jury's finding on limitations, *i.e.*, that Cathey knew or should have known of the facts underlying the breach of fiduciary duty two years or more before the date the lawsuit was filed, entitles Meyer to a take-nothing judgment on the verdict against Cathey.

 The trial court granted Meyer's motion and denied Cathey's motion. The trial court signed a take-nothing judgment in favor of Meyer without specifying on what grounds it was based. We sustain the judgment of a trial court if it is correct on any theory of law applicable to the case and supported by the record, regardless of whether the trial court gives the correct legal reason for the judgment, or whether it gives any reason at all. *See Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939).

### C. Post–Judgment Motions

Cathey filed a motion for new trial claiming, *inter alia*, factually insufficient evidence to support the jury's findings of ratification and waiver.[7] The motion also reiterated his objections to the charge on ratification and waiver, *i.e.*, that the defenses do not apply when damages are sought in a claim for fraud and that the definitions in the jury instructions were erroneous. Cathey also filed a motion to modify, correct, or reform the judgment. This motion addressed the proper limitations period for breach of fiduciary duty and urged the court to render judgment on

that claim for Cathey. These motions were overruled by operation of law.

Meyer did not file a motion for new trial.

Several weeks after judgment, Meyer filed a motion for sanctions claiming that Cathey lied in a deposition and in responses to requests for admissions to inquiries about his background and credentials, and Meyer had to expend thousands of dollars discovering the true facts so he could present them at trial. The trial court granted the motion and awarded close to $26,000 as sanctions.

### III. ISSUES ON APPEAL

Cathey appeals on five issues as to Meyer:

1. The trial court erred in rendering a take-nothing judgment in favor of Meyer because: (a) there was more than a scintilla of evidence to support the jury's findings regarding Cathey's fraud and breach of fiduciary duty claims against Meyer; (b) the jury's finding that Cathey did not know of the fraud more than four years before the lawsuit was filed should not have been disregarded; (c) the statute of frauds does not bar recovery for the fraud claims pertaining to the four projects which were not in writing, because Cathey did not seek recovery for breach of contract; and (d) the foreclosure on the Dallas project does not preclude the recovery of damages.

2. The trial court erred in finding that "ratification" barred recovery on all the fraud claims against Meyer because: (a) there was no evidence that Cathey ratified Meyer's fraudulent acts; (b) the definition of ratification in the charge "essentially de-

---

7. These complaints are not presented on appeal.

fines [the Waco and Dallas projects] out of the ratification defense," because an agreement on Cathey's benefits was never consummated between him and Meyer; and (c) ratification is inapplicable in this case, because normally it applies only when the remedy of rescission of a contract is sought, and it does not apply when, as here, a party merely continues to honor the terms of a contract after he learns he was fraudulently induced to enter into it.

3. Under the facts of this case, there is no difference in the affirmative defenses of "ratification" and "waiver." Therefore, for the same reasons that apply to "ratification," the trial court erred in finding that "waiver" barred recovery on all the fraud claims against Meyer.

4. The trial court erred in finding that limitations bars the recovery against Meyer for breach of fiduciary duty, because a four-year rather than a two-year limitations period applies. Even if the period was two years, the evidence is undisputed that the Waco and Dallas projects did not commence until after the two-year period began.

5. The trial court abused its discretion in awarding sanctions for discovery abuse.

Meyer asserts as cross-issues: (1) the evidence is legally and factually insufficient to support the jury's findings in Cathey's favor, and (2) the trial court erred in its instructions to the jury regarding the breach-of-fiduciary-duty question.

## IV. FRAUD CLAIMS

Cathey presents three issues, two with multiple sub-parts, concerning his fraud claims against Meyer. Each advances a reason why the trial court erred in grant-ing Meyer's post-trial motions. Because Cathey's issues on ratification and waiver, if overruled, would bar recovery as to all or part of the fraud claims, we will discuss those issues first. Next, his issue concerning the statute of frauds, which relates to only the Waco and Dallas projects, will be discussed. Then, his issues concerning the legal sufficiency of the evidence, *i.e.*, that the court erred if it granted the take-nothing judgment on the basis that there was no evidence to support the jury's findings in Cathey's favor, will be discussed. Finally, we will discuss his argument about exemplary damages.

■ Meyer's cross-issues that the evidence supporting the jury's findings favorable to Cathey is legally and factually insufficient occupy one sentence in his fifty-nine-page brief. There are no citations to the reporter's record. Because the trial court had to find that no evidence supports the jury's findings in Cathey's favor before it could disregard those findings (if that was the basis for the judgment), Meyer's cross-issues on legal sufficiency are, of necessity, resolved by our discussion of Cathey's issues on legal sufficiency. However, Meyer has failed to brief his cross-issues on factual insufficiency. The rules of appellate procedure require that "[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to authority and to the record." TEX.R.APP. P. 38.1(h), 38.2(a)(1). This is especially important in a case such as this with a reporter's record consisting of many thousands of pages covering a six-week trial. By his failure, Meyer has waived the cross-issues on factual sufficiency. *E.g. Franklin v. Enserch, Inc.*, 961 S.W.2d 704, 711 (Tex.App.-Amarillo 1998, no pet.); *Sisters of Charity of the Incarnate Word v. Gobert*, 992 S.W.2d 25, 31 (Tex.App.-Houston [1st Dist.] 1997, no pet.); *Leyva v.*

*Leyva,* 960 S.W.2d 732, 734 (Tex.App.-El Paso 1997, no writ).

## A. Ratification and Waiver

The jury found that Meyer defrauded Cathey on eight projects—the acquisition of the four apartment complexes, the refinancing of two apartment complexes, and the Waco and Dallas projects. However, it also found that Cathey ratified and waived the fraud. Ratification and waiver are affirmative defenses which Meyer pled. TEX.R. CIV. P. 94.

Ratification and waiver have extensive application in the law. One application is their assertion as affirmative defenses. It has been said that ratification and waiver are opposite sides of the same coin:

> These two terms have been used interchangeably many times. ... [R]atification and waiver invoke the same factual elements: (1) There must be full knowledge of the known right which vitiates a prior act, and (2) there must be an intentional relinquishment of the known right, or intentional recognition of the prior act, depending upon the user's choice of words. While to relinquish is the gist of "waiver" and to approve is the gist of "ratification," to relinquish a known right is to give validity to the prior act and to approve a prior act is to relinquish a known right.

*Caldwell v. Callender Lake Prop. Owners Imp. Ass'n,* 888 S.W.2d 903, 910 (Tex.App.-Texarkana 1994, no writ) (quoting *Jordan v. City of Beaumont,* 337 S.W.2d 115, 118 (Tex.Civ.App.-Beaumont 1960, writ ref'd n.r.e.)).

■ These are ordinarily questions of fact; however, they can involve questions of law if the facts are clearly established. *Id.*

## 1. Ratification

■ A party fraudulently induced into a contract can under some circumstances ratify the contract and thereby forego a claim for damages for fraud. *Fortune Production Co. v. Conoco, Inc.,* 52 S.W.3d 671, 676 (Tex.2000). In *Fortune Production,* four producers of natural gas sued Conoco claiming that when contracts for purchase of their gas by Conoco were being renegotiated, Conoco told them that the part of the product called "residue gas" was no longer needed by Conoco to supply its regular customers, and so the "residue gas" would have to be sold on the "spot market" at a substantially reduced rate. The producers believed this representation and agreed to significantly lower prices than they had agreed to in previous contracts. In fact, what Conoco told the producers was not true, and Conoco knew it. Some of the producers entered into written contracts with Conoco, binding them to sell gas for a specific term of years at a set price; two producers simply continued to deliver gas to Conoco without a written agreement and accepted the price Conoco paid. There was a factual dispute over when the producers learned Conoco had fraudulently induced them into the contracts. Nevertheless, four years after the initial events, they sued. Conoco alleged that the producers had ratified any fraud because they had full knowledge of it, yet continued to do business under the pricing system Conoco offered.

■ A party may affirm a contract that has been induced by fraud, in such a way that damages are foreclosed. *Id.* at 677. "The question ... is largely one of intent. Hence acts done in affirmance of the contract can amount to a waiver of the fraud only where they are done with full knowledge of the fraud and of all material facts, and with the intention, clearly manifested, of abiding by the contract and waiv-

ing all right to recover for the deception. Acts which, although in affirmance of the contract, do not indicate any intention to waive the fraud, cannot be held to operate as a waiver." *Id.* (quoting *Kennedy v. Bender*, 104 Tex. 149, 135 S.W. 524, 525 (Tex.1911)). For example, accepting benefits under the terms of the fraudulent representation after the fraud is known can bar damages if the nature of the conduct constituting acceptance shows an intentional relinquishment of a known right. *Id.* (citing *Spellman v. American Universal Investment Co.*, 687 S.W.2d 27, 31–32 (Tex.App.-Corpus Christi 1984, writ ref'd n.r.e.)). However, there is an inherent difficulty in stating a bright-line rule about what constitutes ratification, and the determination is made case by case. *Id.* at 678. The Court held that as a matter of law, the acceptance of the contracted-for price after they learned of the fraud, by the producers with written contracts, did not result in their ratification of the fraud, and they could sue for damages. They had a continuing contractual obligation to sell gas to Conoco, and honoring that and receiving the contracted-for price was not a ratification. *Id.* at 679. However, the two remaining producers, by continuing to sell to Conoco without obligation after learning of the fraud and accepting the price offered by Conoco, ratified the fraud and were barred from recovering damages accruing after the ratification. *Id.* at 680. "When they delivered their gas after they knew of Conoco's fraud, with no obligation to continue deliveries, they were no longer relying on misrepresentations." *Id.* at 679. By their conduct "[they] entered into a new series of agreements with full knowledge of all material facts and of the prices that they were accepting." *Id.* at 680.

### 2. Waiver

 "Waiver" is the intentional relinquishment of a known right. *United States Fidelity & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971); *Ford v. Culbertson*, 158 Tex. 124, 308 S.W.2d 855, 865 (1958); *Cal–Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 812 (Tex.App.-Tyler 1999, no pet.). The right may be conferred by law or contract. *Culbertson*, 308 S.W.2d at 865. "Intention" may be either expressly made or inferred from conduct that is inconsistent with an intent to claim the right. *Id.; Owens Handle*, 989 S.W.2d at 812; *Ferrantello v. Paymaster Feed Mills*, 336 S.W.2d 644, 647 (Tex.Civ.App.-Dallas 1960, writ ref'd n.r.e.).

Cathey contends that "ratification" and "waiver" should not be analyzed separately. The jury was instructed in separate questions as follows:

> Ratification occurs when a person, induced by fraud to enter into an agreement, continues to accept benefits under that agreement after he becomes aware of the fraud or breach, or if he conducts himself so as to recognize the agreement as binding.

> Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right.

The Supreme Court in *Fortune Production* declined to express "an opinion on whether a jury issue should be framed in terms of ratification, affirmance, or waiver," noting without citation that "[c]ourts and commentators have variously used the terms 'waiver,' 'ratification,' and 'affirmance' in discussing the legal effect of a party's actions after it learns that its contract was induced by fraud." *Fortune Production*, 52 S.W.3d at 680. Here, because the jury considered the same facts in deciding each question, and because of the commonalities in the definitions of the terms in the charge, we will analyze the

jury's affirmative answers to the ratification and waiver questions as "two sides of the same coin," *i.e.*, either the evidence was legally sufficient to support both or it was legally insufficient to support either. *Jordan,* 337 S.W.2d at 118.

### 3. Standard of Review

■ Cathey's issue on appeal concerns whether the trial court was justified in finding the evidence legally sufficient to support the jury's affirmative findings on ratification and waiver, if that was the basis of the trial court's judgment. When we conduct a review of whether the evidence is legally sufficient, we consider only that evidence and the inferences therefrom which support the jury's findings, considered in the light most favorable to the findings, and disregard contrary evidence and inferences. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Holt Atherton Industries, Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). We can find the evidence legally insufficient if: (1) there is a complete absence of evidence for the findings, (2) there is evidence to support the findings, but rules of law or evidence bar the court from giving any weight to the evidence, (3) there is no more than a mere scintilla of evidence to support the findings, or (4) the evidence conclusively establishes the opposite of the findings. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence"* and *"Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). "More than a scintilla of evidence exists where the evidence supporting the findings, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome,* 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of the finding's existence, the effect is that there is legally-insufficient evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995).

■ Cathey does not complain on appeal about the wording of the charge, and so we will not review any objection to the charge that he made at trial.[8] TEX.R.APP. P. 38.1(e). He does, however, assert that the findings on ratification and waiver are not supported by legally-sufficient evidence and that the trial court erred to the extent it relied on these findings. Accordingly, we review the sufficiency issues under the charge as given, regardless of whether the definitions of ratification and waiver were correctly submitted. TEX.R. CIV. P. 274; *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) ("It is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence."). In *Green Intern., Inc. v. Solis,* both the plaintiff and the defendant prevailed on claims against the other, and the jury awarded both parties attorney's fees.

---

8. At trial, Cathey objected that there was "no evidence" of ratification, and that the submission of the question on ratification was "not a proper submission for fraud allegations generally." In his brief, Cathey relies on the definition of ratification as given: "The very definition of ratification given to the jury, and the evidence at trial essentially defines two Cathey/Meyer projects out of the ratification defense."

He also objected at trial that "there is no evidence to support the submission of the waiver issue," the submission of waiver "is not a proper submission for a defense to fraud," and "the issue and instruction as worded is an improper submission" which he followed with a proffer of his requested definition.

*Green v. Solis,* 951 S.W.2d 384, 389–90 (Tex.1997). Green complained that, as a matter of law, attorney's fees could not be recovered for some of Solis's claims. *Id.* However, the jury charge failed to segregate the claims for which attorney's fees were recoverable from those for which they were not, and Green had failed to object. *Id.* The Court said that without an objection, as long as the jury's finding was supported by the evidence and material, the award must stand. *Id.; see also Allen v. American National Insurance Co.,* 380 S.W.2d 604, 609 (Tex.1964) (An unobjected-to defective submission of a theory of recovery or defense waives a complaint of error concerning the verdict.); *Casteel–Diebolt v. Diebolt,* 912 S.W.2d 302, 304 (Tex.App.-Houston [14th Dist.] 1995, no writ) (Failure to object to omissions from the charge estops a party from complaining on appeal.). By not raising his objections to the wording of the charge as issues on appeal, Cathey has waived them. We turn to his sufficiency issues.

### 4. Four Written Agreements

■ Under *Fortune Production,* any profits from which Cathey should have derived compensation that were unilaterally and thus fraudulently taken by Meyer before Cathey learned of the fraud cannot be ratified, because ratification requires knowledge of the fraud. *Fortune Production,* 52 S.W.3d at 680. The jury was charged under this theory. Furthermore, under *Fortune Production,* Cathey's continued dealings with Meyer under the terms of the contracts are not a ratification, because a party, such as Cathey, who is contractually bound to continue providing services and contractually entitled to continue to receive compensation does not thereby ratify fraudulent conduct. *Id.* at 679. However, this part of the *Fortune* holding was omitted from the charge without objection. Therefore, Cathey cannot rely on the latter holding in *Fortune Production,* and we will review the evidence under the charge as given. *Osterberg,* 12 S.W.3d at 55.

■ Cathey and Meyer had written agreements on the four apartment-complex projects. Before Cathey could be said to have ratified Meyer's alleged fraudulent misrepresentation, *i.e.,* his non-disclosure that he intended to reduce the profits from the complexes through consultant fees, Cathey would first have to learn about Meyer's fraud. The evidence at trial was that Cathey had access to the financial records kept by Meyer; but it was not shown that Cathey reviewed the records and learned of Meyer's actions. Therefore, because the charge required actual knowledge by Cathey, the evidence of ratification and waiver regarding the four apartment-complex projects is legally insufficient to support the jury's verdict.

### 5. Two Refinancing Projects, and the Waco and Dallas Projects

The fraud Cathey alleged regarding the four oral agreements was that Meyer promised specific financial rewards without intending to pay them. In 1995, Cathey worked on the refinancing of the Silverado Apartments and the Arbors Apartments. Based on the oral "global agreement," Cathey claimed that Meyer misrepresented that Cathey would get a $25,000 bonus for any project he helped refinance. As for the Waco and Dallas projects, which commenced in approximately June 1995, Cathey claimed Meyer misrepresented that in exchange for Cathey's services, he would receive fifteen percent of the profits from the Waco project and ten percent of the profits from the interest Meyer owned in the Dallas project. Cathey participated in these two projects in some form until the

summer of 1996, when his relationship with Meyer abruptly ended.

Again, ratification and waiver require some voluntary action *after* discovery of the fraud which either relinquishes a right or validates the fraud. The evidence conclusively shows that Cathey performed services on these four projects before he realized Meyer did not intend to fully honor his promises about compensation, *i.e.*, before Cathey learned of the fraud. *Juliette Fowler*, 793 S.W.2d at 666 n. 9. After he learned of it, the evidence does not show specific acts of relinquishment or validation. Although there is evidence that, during the course of his numerous business dealings with Meyer over the years, Cathey knew he had not gotten the full benefit of some of his bargains with Meyer in the past, this does not establish that, during the course of the projects, Cathey became aware of Meyer's fraud and then performed acts of ratification or waiver.

The evidence shows that, regarding these four different projects, Cathey was made promises of financial rewards in exchange for services, he performed services, and the full measure of the rewards promised was not given. In each instance, the jury found that fraud had occurred. We find no more than a scintilla of evidence that Cathey intentionally relinquished his rights under these four agreements or intentionally validated the fraud. *Id.* Therefore, there is legally insufficient evidence to support the jury's findings of ratification and waiver regarding these four projects.

### 6. Conclusion

There is legally insufficient evidence of ratification and waiver regarding any of the eight fraud claims. The trial court erred if it rendered a take-nothing judgment based on these affirmative defenses.

### B. Statute of Frauds

Meyer argued in his post-trial motion that because Cathey's fraud claims derive from the "global agreement" in 1993, a contract that could not be performed in one year, the statute of frauds applies. He says because there was no written agreement on the Waco and Dallas projects which were begun in 1995, the fraud claims pertaining to them must fail.[9] Meyer attempts to characterize the agreements Cathey claimed he had with Meyer on the Waco and Dallas projects as dating back to 1993 when the "global agreement" was formed. He asserts that because the "global agreement" was not intended to be performed in one year, Cathey's fraud claims fail under the statute of frauds. Tex. Bus. & Com.Code Ann. § 26.01(b)(6) (Vernon 2002); *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex.2001) (Benefit-of-the-bargain damages under a claim of fraudulent inducement into a contract are not recoverable if a claim of breach of the contract would fail under the statute of frauds.).

But the Waco and Dallas projects were not begun until 1995. There was evidence that the two agreements were "new" agreements, although some of their terms regarding Cathey's compensation may have derived from the "global agreement." In addition, the evidence does not establish that either project could not be performed in one year, and there was no jury finding on the issue. Therefore, there is legally insufficient evidence to support application of the statute of frauds, and the trial court

---

9. The statute of frauds is an affirmative defense which must be pled and proved by the defendant. Tex.R. Civ. P. 94.

erred if it rendered a take-nothing judgment based on this affirmative defense.

## C. Legal Sufficiency of the Evidence for the Fraud Claims; Jury Charge Issue

Cathey asserts on appeal that there was some evidence to support the jury's findings of fraud regarding each of the eight projects, and therefore the trial court erred in granting Meyer's motion for judgment notwithstanding the verdict or to disregard jury findings, if that was the basis for the judgment.

### 1. Standard of Review

We review the granting of a motion for judgment notwithstanding the verdict or a motion to disregard a jury finding in the light most favorable to the finding, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor. *Navarette v. Temple Independent Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986); *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987). We review for whether there is more than a mere scintilla of evidence to support the jury's finding. *Basin Operating Co. v. Valley Steel Products*, 620 S.W.2d 773, 776 (Tex.Civ.App.-Dallas 1981, writ ref'd n.r.e.); *see Farias v. Laredo Nat'l Bank*, 985 S.W.2d 465, 470 (Tex.App.-San Antonio 1997, no writ); *Quinn*, 726 S.W.2d at 19. "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499.

### 2. Four Written Agreements

■ First, Meyer's post-trial motion argued that the evidence proved as a matter of law that Cathey knew prior to the execution of the four written agreements that Meyer was not going to honor the "global agreement." This argument misses the point, because the fraudulent misrepresentation Cathey undertook to prove is the non-disclosure by Meyer about the consulting fees which affected the net profits under the four written agreements.

■ Next, Meyer argued there was no evidence that when he entered into these four agreements, he intended to later divert profits through consulting fees. "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986) (citations omitted). " 'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* (citing *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex.Civ.App.-El Paso 1951) (orig.proceeding)); *see Johnson & Higgins of Texas v. Kenneco Energy*, 962 S.W.2d 507, 527 (Tex.1998). There is evidence that, without telling Cathey, Meyer paid himself consulting fees which had the effect of denying Cathey income derived from profits from the apartment complexes. Construing the evidence in the light most favorable to Cathey, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor, we find that there was more than a scintilla of evidence from which the jury could have concluded that, at the time he entered into the four written agreements, Meyer intended to reduce or eliminate the profits by payment to himself of consulting fees. *Navarette*, 706 S.W.2d at 309.

■ Continuing to address proof of the elements of fraud, Meyer asserted in his post-trial motion that the evidence was

legally insufficient to support a finding that any fraudulent misrepresentations by him proximately caused damages to Cathey. The jury was asked whether Meyer's fraud was the cause of Cathey's damages and was given a "proximate cause" instruction.[10] When the damages are "special" damages, proximate cause is shown if (1) the fraud was a substantial factor in bringing about the damages, without which the damages would not have occurred, and (2) a person of ordinary intelligence would have foreseen that the damages might result from the fraud. *See Libhart v. Copeland*, 949 S.W.2d 783, 799 (Tex.App.-Waco 1997, no writ); Texas PJC—Business, Consumer, Insurance & Employment (2000), PJC 110.19. The evidence supports each of these components. Again, construing the evidence in the light most favorable to Cathey, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor, we find that there was more than a scintilla of evidence from which the jury could have concluded that Meyer's non-disclosure proximately caused Cathey's damages. *Navarette*, 706 S.W.2d at 309.

In a fraud case, the plaintiff must prove he relied on the misrepresentation to his detriment. *Johnson & Johnson Med., Inc. v. Sanchez*, 924 S.W.2d 925, 929–30 (Tex.1996). Meyer asserted in his motion to disregard and for judgment that there was no evidence to support a finding of reliance by Cathey on Meyer's misrepresentation under the "global agreement." Again, Meyer misunderstands Cathey's claim. The claim is about Meyer's non-disclosure at the time he entered into the four written agreements with Cathey concerning Meyer's intent to pay himself con-

sulting fees. If Cathey had known he would not receive profits from the apartment complexes because there would be less or no profits, a reasonable inference is that he would not have entered into the agreements. Construing the evidence in the light most favorable to Cathey, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor, we find legally-sufficient evidence to support a finding of reliance. *Navarette*, 706 S.W.2d at 309.

Finally, Meyer claimed (1) the evidence shows as a matter of law that Cathey was fully compensated for the Silverado Apartments, Polo Club Apartments, and Valley Ranch Apartments projects, and (2) there was no evidence of damages for the Arbors Apartments project because Cathey was to be compensated as a limited partner and not under a distribution-of-profits agreement. Meyer's argument amounts to no more than his version of what the evidence was. But, in reviewing a no-evidence issue, we must construe the evidence in the light most favorable to the jury's findings, and we must consider only the evidence and inferences which support the findings, and indulge every reasonable inference in favor of the findings. *Id.* Cathey testified about the events and the projects, introduced the four written contracts, and presented a damages expert, Larry Canter, who reviewed financial documents and calculated what Cathey should have received in compensation. The jury awarded about one-half the amount of damages that Canter calculated. We find that there was more than a scintilla of evidence from which the jury could have determined the amount of damages it awarded on each of the four projects. *Id.*

---

**10.** Again, we measure sufficiency of the evidence against the charge as given. *Osterberg,*

12 S.W.3d at 55.

In conclusion, the evidence was legally sufficient to support the jury's findings of fraud and damages regarding the projects covered by the four written agreements.

### 3. Two Refinancing Projects

As to the refinancing of the Silverado Apartments and the Arbors Apartments, Meyer asserted in his motion: (a) the evidence proved as a matter of law that Cathey was not entitled to a bonus for his services; (b) there is no evidence that when the agreement for Cathey's services was entered into, Meyer intended not to pay Cathey; and (c) there is no evidence Cathey relied on a promise of a bonus when he performed services for refinancing. As for damages, Meyer also asserted the evidence proved as a matter of law that there was no money left after closing from which a bonus could have been paid, and therefore Cathey failed to prove damages.

■ First, the evidence was disputed about whether Cathey's agreements required him to perform the services solely for a contractual fee, so that he was not entitled to a bonus. Cathey testified that as part of the "global agreement," he was to receive a bonus in addition to other fees. The jury heard the evidence and concluded that Cathey was entitled to damages. Construing the evidence in the light most favorable to the jury's findings, considering only the evidence and inferences which support the findings, and indulging every reasonable inference in favor of the findings, we find that there was more than a scintilla of evidence from which the jury could have found an agreement to pay a bonus. *Id.*

Second, Meyer's contention that there was no evidence to prove his fraudulent intent at the time the two agreements were made fails for the same reason it did with the four written. Intent to defraud is usually proven by circumstantial evidence. *Spoljaric v. Percival,* 708 S.W.2d at 435. " 'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.* The evidence was legally sufficient to prove intent.

■ Third, Meyer's claim of no reliance by Cathey also fails for the same reasons as applied to the four written agreements. Cathey testified he performed the refinancing services in part because be relied on Meyer's promises to pay him a bonus. The evidence was legally sufficient to prove reliance.

■ Finally, the argument that the evidence may show there was no money from which a bonus could have been paid misses the point. Cathey testified he had an agreement to receive a bonus if he obtained refinancing. That Meyer claims he had no money to pay the bonus does not detract from the existence of the agreement. The jury, having heard all the evidence, concluded that Cathey had been told by Meyer that he would pay Cathey a bonus. Construing the evidence in the light most favorable to Cathey, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor, we find that the evidence was legally sufficient to support the jury's award of damages. *Navarette,* 706 S.W.2d at 309.

In conclusion, we find legally-sufficient evidence to support findings that Meyer fraudulently induced Cathey into providing services regarding the two refinancing agreements, resulting in damages.

### 4. Waco and Dallas Projects

Meyer asserted in his motion to disregard and for judgment the following about the Waco and Dallas projects:

1. There was no evidence Cathey was entitled to compensation for work on the Waco and Dallas projects in addition to his salary, and therefore there was no evidence of damages for these projects.
2. There was no evidence that at the time the Waco and Dallas projects were formed, Meyer intended not to pay Cathey.
3. Cathey's damages for fraud on the Dallas project were derived from a twenty-percent interest in any profit distributed by the limited partnership which developed that project. Because the Dallas project was foreclosed on, the partnership never made any profit, and therefore as a matter of law Cathey has not proved his entitlement to damages.
4. The damages question for fraud regarding the Waco and Dallas projects asked for benefit-of-the-bargain damages. However, the fraud question asked whether Meyer fraudulently induced Cathey to provide services for which he was not fully compensated. Therefore, the damages question should have asked about the value of those services. Because it did not, the proper measure of damages was not used, and damages are not recoverable.

▇▇▇ First, Meyer contended there was no evidence Cathey was entitled to compensation other than his salary. However, this was a disputed fact issue. Cathey testified he was promised various percentages of profits. Also, one of the four documents Meyer presented to Cathey for signature just before their business relationship ended referred to an agreement on the Dallas project for compensation based on a percent interest. The jury found for Cathey. Viewing the evidence in the light most favorable to the findings, we find legally-sufficient evidence to support the findings. *Id.*

Meyer's second contention fails for the same reasons as before, *i.e.*, intent is usually proven by circumstantial evidence, and " '[s]light circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Spoljaric,* 708 S.W.2d at 435. Construing the evidence in the light most favorable to the findings, the evidence was legally sufficient to prove intent. *Navarette,* 706 S.W.2d at 309.

▇▇▇ The third complaint was about Cathey's compensation for the Dallas project. The jury was asked to consider "the difference between the value as represented and the value received." The "represented value" was that Cathey would receive a percentage of the profit, if any. The evidence was that due to cost overruns, the project went deeply into debt, ultimately resulting in foreclosure. Therefore, because there was no profit, Meyer contended that Cathey did not show damages. Cathey, however, argues that because the project was purchased at foreclosure two years later by another limited partnership newly-formed by Meyer, and has become profitable since, there was ultimately a profit from which he can recover. He says that his agreement with Meyer extends across time to these events. We do not agree. The original agreement specifically pertained to the development of the condominium project and any profit realized from it. There was no profit. There was no evidence that, at the time the agreement was made, Meyer and Cathey intended that it would apply to subsequent events involving different business entities. Thus we find no evidence of Cathey's damages on the Dallas project.

Meyer's final complaint raised in his motion concerns the jury charge and the wording of the damages question. The jury was instructed to consider "the following elements of damages, if any, and none other: the difference between the value as represented and the value received." The jury awarded $150,000 in damages for the Waco project and $750,000 for the Dallas project. Meyer did not object to the instruction about damages that was submitted, and therefore the trial court erred in granting Meyer's post-verdict motion based on this issue, if it did. TEX.R.APP. P. 33.1.

We agree with Cathey's contention that there was legally-sufficient evidence to support the damages awarded for the Waco project. Construing the evidence in the light most favorable to the jury's finding, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in favor of the finding, we find legally sufficient evidence to support the jury's $150,000 award. *Navarette*, 706 S.W.2d at 309.

### 5. Conclusion

Except for the damages award on the Dallas project, the evidence is legally sufficient to support the jury's findings concerning fraud and the resulting damages.

### D. Exemplary Damages

The charge contained two questions pertaining to exemplary damages regarding the Waco and Dallas projects. The first, derived from section 41.003 of the Civil Practice and Remedies Code, asked whether the jury found by "clear and convincing evidence that the harm to Cathey by Meyer resulted from fraud." TEX. CIV. PRAC. & REM.CODE ANN. § 41.003 (Vernon 1997); *North American Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 127 (Tex.App.-Beaumont 2001, no pet.). The jury was instructed that " 'clear and convincing evidence' means the measure or degree of proof that produces a firm belief or conviction of the truth of allegations sought to be established." The jury answered "yes" and in a separate question awarded $2,250,000 in exemplary damages.

Meyer complained in his post-verdict motion that the evidence of fraud was legally insufficient under a "clear and convincing" standard. Meyer also complained that the amount of exemplary damages is capped by section 41.008 of the Civil Practice and Remedies Code. *Id.* at § 41.008(b). On appeal, Cathey maintains that there is factually sufficient evidence to support the jury's finding of "clear and convincing" evidence, and does not address the "cap" issue. Because Meyer waived cross-issues on factual sufficiency, we will review for whether there was legally-sufficient evidence to support the finding. The "no evidence" standard is the same for findings made under the "clear and convincing" standard as for a preponderance standard. Bill Vance, *The Clear and Convincing Evidence Standard in Texas: A Critique*, 48 Baylor L.Rev. 391 (1996).

The jury heard six weeks of testimony about Meyer's and Cathey's business dealings. Again, applying the same legal standard as we did under a "preponderance" standard, when we construe the evidence in the light most favorable to the jury's findings, consider only the evidence and inferences which support the findings, and indulge every reasonable inference in their favor, we find more than a scintilla of evidence to support the jury's findings that the harm resulted from fraud. *See id.*

However, the exemplary damages question concerned both the Waco and Dallas projects combined, and there was no objection or request to segregate damages. Furthermore, we have determined

that there is no evidence of actual damages for the Dallas project. Consequently, Cathey cannot recover exemplary damages for the Dallas project, because actual damages are a prerequisite to that. Tex. Civ. Prac. & Rem.Code Ann. § 41.004(a) (Vernon 1997); *Juliette Fowler,* 793 S.W.2d at 667 (citing *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 753–54 (Tex.1984)). Therefore, because we cannot know how the jury proportioned exemplary damages between the two projects, if it did, we have no basis on which to uphold exemplary damages for Cathey or render a different amount. Also, we will not remand for a new trial solely on exemplary damages, because that would deny the jury on retrial an opportunity to hear all the relevant evidence. *See Ford Motor Co. v. Miles,* 967 S.W.2d 377, 389–90 (Tex.1990); *Health Care Centers of Texas, Inc. v. Nolen,* 62 S.W.3d 813, 817 (Tex.App.-Waco 2001, no pet.); *Green Tree Financial Corp. v. Garcia,* 988 S.W.2d 776, 785 (Tex.App.-San Antonio 1999, no pet.). Therefore, we must remand for a new trial on the fraud claim pertaining to the Waco project.

### E. Conclusion—All Fraud Claims

The evidence was legally sufficient to support the jury's findings regarding all eight fraud claims, except as to damages from the Dallas project. Because both the Dallas and the Waco projects are the basis of the exemplary damages the jury awarded, the fraud claim about the Waco project, including the exemplary damages claim, must be remanded for a new trial.

We will affirm the take-nothing judgment on the fraud claim pertaining to the Dallas project. We will reverse the judgment on the fraud claims pertaining to the four written agreements and the two refinancing projects and render judgment that Cathey recover $72,500 in damages as found by the jury. We will reverse the

judgment on the fraud claim pertaining to the Waco project, sever that claim, and remand it for a new trial.

### V. BREACH OF FIDUCIARY DUTY CLAIM

The jury found Meyer breached a fiduciary duty to Cathey on the Waco and Dallas projects and awarded Cathey $150,000 on the Waco project and $750,000 on the Dallas project. But the jury's answer to a question concerning the limitations period for this claim favored Meyer. Meyer pled limitations as an affirmative defense. Tex.R. Civ. P. 94.

Previously, in our discussion of his fraud claims, we found that Cathey did not establish any damages on the Dallas project. Although the elements of damages in the jury charge were different for fraud and breach of fiduciary duty, the same reasons we relied on in the discussion of damages under fraud apply to the lack of evidence to support a damages finding under breach of fiduciary duty on the Dallas project. Thus we do not address Cathey's issue regarding any breach of fiduciary duty on that project.

█ We will, however, review the claim about the Waco project. And if we reverse and render judgment on this claim, we must remand it so that Cathey may make an election to recover under the fraud claim or the breach of fiduciary duty claim. Cathey cannot have a double recovery of lost income on the Waco claim due to the "one satisfaction rule." *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390–91 (Tex.2000) (When a defendant commits technically different acts that result in a single injury, a plaintiff is entitled to only one recovery for any damages suffered.); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7–8 (Tex.1991).

As with the fraud claims, Meyer's cross-issues on legal sufficiency are, of necessity,

resolved by our discussion of Cathey's issues on legal sufficiency. However, by failing to brief his cross-issues on factual insufficiency and on the charge question concerning whether Meyer had a fiduciary duty to Cathey, Meyer has also waived those complaints. TEX.R.APP. P. 38.1(h), 38.2(a)(1).

## A. Limitations

 The jury found that Cathey knew or should have known "on or before May 22, 1995," of the facts underlying Meyer's breach of fiduciary duty. Cathey filed the lawsuit on May 22, 1997. Thus, if there is a two-year limitations period for the breach of fiduciary duty claim, Cathey's claim may be barred.[11] Meyer cites case law holding that the limitations period is two years. Cathey cites section 16.004 of the Civil Practice and Remedies Code which says the period is four years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(a)(5) (Vernon 2002). Section 16.004(a)(5) became effective August 30, 1999, after the trial in July. Meyer claims the statute cannot operate retroactively. Cathey responds that the statute merely clarifies a conflict in the case law rather than imposing a new law. He cites section 2 of Acts 1999, 76th Leg., ch. 950 which provides: "(a) The intent of this Act is to clarify existing law by resolving a conflict in case law concerning the applicable statute of limitations for actions for fraud and breach of fiduciary duty."

Before the statute became effective, some courts held the limitations period was two years. *E.g. International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 579 (Tex.1963) (citing only *Glenn v. Steele*, 141 Tex. 565, 61 S.W.2d 810 (Tex. 1933) (holding the limitations period for a fraud claim is two years));[12] *Maxson v. Travis County Rent Account*, 21 S.W.3d 311, 319 (Tex.App.-Austin 1999, pet. dism. agr.); *Redman Industries, Inc. v. Couch*, 613 S.W.2d 787, 789 (Tex.App.-Houston [14th Dist.] 1981, writ ref'd n.r.e.). However, others held it was four years. *E.g. McGuire v. Kelley*, 41 S.W.3d 679, 682 (Tex.App.-Texarkana 2001, no pet.) (Before section 16.004(a)(5), "the appellate courts generally held that a four-year statute of limitations was appropriate in cases where breach of fiduciary duty claims were coupled with fraud claims."); *In re Estate of Herring*, 970 S.W.2d 583, 587 (Tex.App.-Corpus Christi 1998, no pet.) (citing the residual four-year statute of limitations, TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 1997)); *Rowe v. Rowe*, 887 S.W.2d 191, 201 (Tex.App.-Fort Worth 1994, writ denied) (citing section 16.051 of the Civil Practice and Remedies Code).

Section 16.004(a)(5) resolved the conflict in the case law. As to what the limitations period was before the statute went into effect, we agree with the courts which have held, and for the reasons stated therein, that in a pre–1999 case in which allegations of fraud and breach of fiduciary duty are coupled, the limitations period is four years. *See Williams v. Khalaf*, 802 S.W.2d 651, 654–58 (Tex.1990) (Those torts which developed from the common law of "trespass" have a two-year limitations period. Torts related to debts, *e.g.*, "fraud," have a four-year limitations period.). Thus the "retroactivity" argument is without merit. Accordingly, the jury's answer to

---

**11.** Because of the way the question was worded, *i.e.,* "on or before," the jury may have found that Cathey knew or should have known on May 22, in which case he filed the lawsuit on the last day of the limitations period.

**12.** The limitations period for a fraud claim is now four years. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004(4) (Vernon Supp.2002).

the limitations question does not bar Cathey's claim of breach of fiduciary duty, and the trial court erred in granting Meyer's motion for judgment on this basis, if it did. We sustain the issue.

## B. Legal Sufficiency of the Evidence

The issues are (1) whether Meyer had a fiduciary duty to Cathey, (2) if so, did he breach the duty, and (3) was there "some evidence" of damages.

### 1. Standard of Review

To reiterate, we review the granting of a motion to disregard a jury finding in the light most favorable to the finding, considering only the evidence and inferences which support the finding, and indulging every reasonable inference in its favor. *Navarette*, 706 S.W.2d at 309. We review for whether there is more than a mere scintilla of evidence to support the jury's finding. *Basin Operating Co. v. Valley Steel Products*, 620 S.W.2d 773, 776 (Tex. Civ.App.-Dallas 1981, writ ref'd n.r.e.); *see Farias v. Laredo Nat'l Bank*, 985 S.W.2d 465, 470 (Tex.App.-San Antonio 1997, no writ); *Quinn*, 726 S.W.2d at 19. "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499.

### 2. Fiduciary Duty

The jury found that a relationship of trust and confidence existed between Meyer and Cathey. The jury instruction read: "A relationship of trust and confidence existed if Cathey justifiably placed trust and confidence in Meyer to act in Cathey's best interest. Cathey's subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence." Meyer contends he had no duty as a fiduciary to Cathey; they merely had business dealings.

Cathey argues that Meyer had an "informal" fiduciary duty to him. An "informal" fiduciary duty "may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Associated Indem. Corp. v. CAT Contracting*, 964 S.W.2d 276, 287 (Tex. 1998). The relationship "must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* at 288. In other words, there must be a preexisting special relationship of trust and confidence which is betrayed in later dealings.

Prior to the Dallas and Waco projects, Cathey and Meyer worked together on other projects for three years. Cathey had a five percent partnership interest in one of the apartment complex projects, and he co-signed a security agreement for a loan used to finance it. The parties do not dispute that Meyer was always in charge of all aspects of the projects and made the final decisions. Meyer controlled the financing and the books, and Cathey relied on and trusted Meyer to treat him fairly and keep accurate financial records. Meyer told Cathey the two of them would "make millions" together. Cathey considered Meyer a friend; he testified they ate lunch together every day for four years. Therefore, we find more than a mere scintilla of evidence that a fiduciary relationship existed. *See id.* at 287.[13] The

13. In a cross-issue, Meyer reurged his trial objection that the charge question on whether there was a fiduciary relationship was defective. In his cross-issue he does not assert in what manner nor how it resulted in an improper judgment. Tex.R.App. P. 38.1(h), 38.2(a)(1). Accordingly, his cross-issue is overruled.

evidence is legally sufficient to support the jury's finding that "Cathey justifiably placed trust and confidence in Meyer to act in Cathey's best interest."

### 3. Breach of Fiduciary Duty

■ Sometime in early 1995, Cathey began work on the Waco movie theater project. Discussions became more serious between potential partners in June 1995. Cathey testified Meyer initially promised him a ten to fifteen percent interest. Later, Meyer took Cathey off the project claiming Cathey had too much work to do on other projects. In June 1996, a partnership agreement was reached between Meyer and Mark and Morris Schulman, and a limited partnership was set up. Cathey was designated as the manager of the partnership. However in June 1996, Cathey received a memorandum from Meyer disavowing any financial interest of Cathey in the project, because Cathey did not find the project for Meyer (true) and Cathey was not involved in the project. Cathey contended that his work refinancing two of the apartment complexes to free up money for the Waco project constituted working on it.

Meanwhile, in June 1995, Cathey found the property in Dallas and proposed to Meyer that a condominium be built there. He testified he "could have" taken the property to someone else if he had not been working with Meyer. There was no evidence at trial of what percent "finders" of property could get from other investors. Cathey met with a builder and others about the possibilities for the project, and he provided a financial analysis to Meyer. When an agreement between investors was finally struck in 1996, Cathey testified that he thought he would receive ten percent of the interest in the project owned by the limited partnership Meyer had set

up for the project. After the condominiums were built, due to cost overruns, the property was foreclosed on in January 1998. Meyer formed another limited partnership and purchased the property at foreclosure.[14] Meyer asserts that if Cathey had any interest in the project, he was not entitled to damages because the project never made any money for the initial limited partnership.

As previously stated, in August 1996, Meyer presented Cathey with several documents and demanded he sign them. One was a general release of any interests Cathey might have in any of the projects he had been involved with. Another was a document showing Cathey was Meyer's employee, which Meyer said he needed for tax purposes. It contained provisions dramatically cutting Cathey's monthly salary, and binding Cathey to a non-competition agreement. A third document stated Cathey would get five percent of net profits from the Dallas project. If Cathey did not sign all the documents, he would get no interest in the Dallas project. Cathey refused to sign any of the documents. Meyer had the locks changed on Cathey's office; their relationship ended.

The jury was asked if Meyer failed to comply with his fiduciary duty to Cathey, and it answered "yes." However, the charge stated that to prove Meyer complied with his duty, Meyer must show:

1. The transaction in question was fair and equitable to Cathey;

2. Meyer made reasonable use of the confidence that Cathey placed in him;

3. Meyer acted in the utmost good faith and exercised the most scrupulous honesty toward Cathey;

---

**14.** Evidently the property is currently profitable.

4. Meyer placed the interests of Cathey before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Cathey, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; **and**

5. Meyer fully and fairly disclosed all important information to Cathey concerning the transaction.

As submitted, *i.e.*, in the conjunctive, if the jury found any one of these five factors not supported by a preponderance of the evidence, it could find that Meyer breached his duty.[15] We find there was some evidence that Meyer: (1) made but failed to keep promises about the financial interests Cathey would receive in the Waco project, resulting in unfairness to Cathey; (2) took advantage of Cathey's confidence in Meyer; (3) acted in bad faith; (4) placed his own interests above Cathey's and used his superior bargaining position to benefit at Cathey's expense; and (5) was not completely forthcoming with Cathey. Thus we find that the evidence is legally sufficient to support the jury's finding of Meyer's breach of his fiduciary duty to Cathey.

### 4. Damages

■ The jury was instructed to consider "the following elements of damages, if any, and none other: the value of any property, income, or business interests lost as a natural, probable, and foreseeable consequence of Meyer's breach of fiduciary duty." Cathey's financial expert, Canter, testified that Meyer should have paid Cathey over $238,000 on the Waco project.[16] The jury awarded $150,000 in

damages. Meyer did not object to the elements of damages submitted, and therefore waived his cross-claim about them. TEX.R.APP. P. 33.1. Considering the wide range of elements the jury could consider, we find some evidence to support the $150,000 award on the Waco project. *See Green*, 951 S.W.2d at 389–90.

### C. Conclusion

The trial court erred in rendering a take-nothing judgment on the breach of fiduciary duty claim. The statute of limitations is four years; some evidence supports the jury's finding that Meyer had a fiduciary duty, that he breached it, and that the breach proximately caused $150,000 in damages. Thus, we will reverse the judgment as to that claim, render an interlocutory judgment for $150,000, but remand the claim to the trial court.

### VI. DISCOVERY SANCTIONS

■ Cathey's sixth issue asserts that the trial court erred in awarding monetary sanctions against him for discovery abuse. When Cathey and Meyer were exploring a business relationship in 1992, Cathey gave Meyer a resume. Cathey does not now dispute that the resume contained numerous false statements about his work experience and education. At his pre-trial deposition, Cathey said the resume was accurate. Also, Cathey refused to admit to some of the inaccuracies when served with requests for admissions.

Meyer expended sums for several depositions, some out-of-state, for attorney's fees, and for other costs and expenses to find individuals who knew the truth about Cathey's work history and educational

---

**15.** This submission essentially shifted the burden to Meyer to prove he did not breach his duty. Meyer did not object to this at trial.

**16.** We found no evidence of damages for the Dallas project.

background. At trial, Cathey was confronted with his false resume and admitted it was not accurate. Almost a month after judgment, Meyer filed a motion for discovery sanctions seeking to recover the expenditures he made for the investigation of the misrepresentations in Cathey's resume. TEX.R. CIV. P. 215.3, 215.4. The trial court granted the motion and awarded $25,978.73 as sanctions.

Cathey claims that as a matter of law, discovery sanctions cannot be recovered under the facts of this case via a post-trial motion for sanctions. He cites *Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167 (Tex.1993), to support his contention. In *Remington*, the Supreme Court said:

> Remington contends that no trial court may impose discovery sanctions posttrial for pretrial discovery abuse. We cannot agree. Such a rule would absolutely bar imposition of sanctions for discovery abuse revealed for the first time during or after the trial. We do, however, agree that the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct. *Olney Savings & Loan Ass'n v. Farmers Market of Odessa, Inc.*, 764 S.W.2d 869, 871 (Tex.App.-El Paso 1989, writ denied); 3 Roy W. McDonald, Texas Civil Practice § 17.9. Here, of the twelve incidents of misconduct cited in the sanctions order, nine concern pretrial conduct of which Craig was aware before trial. We hold that Craig waived any objections to these matters by failing to request a pretrial hearing on the alleged discovery abuse and by requesting a preferential trial setting. *See McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 75 (Tex.1989); Rule 3.02(a)(4), Local Rules of Practice of the 23rd Judicial Districts of Texas. On the other hand, if pretrial discovery abuse is not revealed until after the trial has begun, or even after trial, a party cannot be said to have waived a claim for sanctions.

*Id.* at 170.

Meyer also cites *Remington*, but he claims it does not bar his post-trial motion because, although he had evidence pretrial that Cathey had lied in his deposition and answers to requests for admissions, "[a]t most, Meyer had elicited testimony from other individuals that contradicted some of Cathey's resume entries. Meyer was not in a position to assert a pretrial motion for sanctions alleging perjury on the basis of evidence that created nothing more than a 'swearing match' between Cathey and some third-party." (APPELLEE'S BRIEF p. 57). In other words, he says that unless and until Cathey admitted at trial he had lied on his resume, Meyer did not have "conclusive" evidence to file a sanctions motion.

◼ We review imposition of sanctions under Rule 215 for abuse of discretion. *Koslow's v. Mackie*, 796 S.W.2d 700, 704 (Tex.1990); *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986); *U.S. Fidelity and Guar. Co. v. Rossa*, 830 S.W.2d 668, 672 (Tex.App.-Waco 1992, writ. denied). A trial court abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992).

We view Meyer's approach of waiting until trial to confront Cathey as trial strategy. Meyer had evidence with which to impeach Cathey's credibility, and he want-

ed to use it at trial to prejudice the jury. But *Remington* requires Meyer to make a choice: air the matter pre-trial in a motion for sanctions and lose the advantage of surprise at trial by confronting Cathey with the information, or do nothing pre-trial and use the matter to his advantage at trial, but thereby waive his objection under Rule 215. Meyer had a reasonable evidentiary basis on which to base a pre-trial motion for discovery sanctions. Furthermore, application of Meyer's contention that he had to wait until trial for Cathey to admit to the falsifications before he had sufficient grounds to file the motion would effectively nullify the rule in *Remington,* because in most cases a party could make this claim as an excuse for not filing its sanctions motion until after trial.

We find that the trial court abused its discretion in imposing sanctions. We sustain issue six.

## VII. CONCLUSION

We reverse the take-nothing judgment on the fraud claims regarding the four written agreements and the two refinancing projects, *i.e.,* on the six fraud claims other than the fraud claims pertaining to the Waco and Dallas projects. We render judgment for Cathey on these six claims for $72,500, prejudgment interest on this amount at 10% per annum from May 22, 1997 to August 26, 1999, and postjudgment interest at the rate of 10% per annum from August 27, 1999, the date of final judgment, until the date of payment.

We reverse the take-nothing judgment on the fraud claim pertaining to the Waco project, on which Cathey is entitled to a new trial on liability and on actual and exemplary damages.

We reverse the take-nothing judgment on the breach-of-fiduciary-duty claim pertaining to the Waco project, and render an interlocutory judgment for Cathey for $150,000, prejudgment interest on this amount at 10% per annum from May 22, 1997 to August 26, 1999, and postjudgment interest at the rate of 10% per annum from August 27, 1999, the date of final judgment, until the date of payment.

We affirm the take-nothing judgment on the fraud and breach-of-fiduciary claims pertaining to the Dallas project.

We reverse the order granting sanctions and order that Meyer take nothing by his motion for sanctions.

We sever the fraud claim pertaining to the Waco project and the interlocutory judgment pertaining to the breach-of-fiduciary duty claim for the Waco project, order these two claims into a separate cause, and remand that cause to the trial court for further proceedings consistent with this opinion.

Eighty percent (80%) of costs in the trial court and this court are assessed against Meyer, and twenty percent (20%) of costs in the trial court and this court are assessed against Cathey.

Justice TOM GRAY dissenting.

TOM GRAY, Justice, dissenting.

Where to begin?

## THE APOLOGY

First, I guess, with an apology. My apology to the litigants.

Much of the delay in the disposition of this appeal has been caused by me, either indirectly or directly. Indirectly because the Legislature by statute and the Supreme Court by rule have prioritized other cases as more important or more deserving of a quicker resolution than a civil case involving a money judgment.

Highest in the priorities are those cases given special priority or precedence by

law, for example, adjudications of juvenile delinquency and termination of the parent-child relationship. TEX.R.APP. P. 40.1(a); *see* TEX. FAM.CODE ANN. §§ 56.01(h), 109.02(a) (Vernon 2002). Next are accelerated appeals, including the ever-expanding list of interlocutory appeals. TEX.R.APP. P. 40.1(b); *id.* 28; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a) (Vernon Supp.2003), *amended by* Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 1.03 (effective Sept. 1, 2003). Next are cases to which the Court gives precedence "in the interest of justice," and it is my understanding that such cases include those involving family relationships, particularly those concerning children. *See* TEX.R.APP. P. 40.1(c). Then there are the numerous criminal cases. *Id.* 40.2. And on the bottom of the Legislature's and Supreme Court's lists are cases like this one, a general civil case involving a money judgment. I have honored those priorities.

Overlay all of these with original proceedings, such as petitions for writs of habeas corpus and mandamus, which this Court has, in the past, endeavored to deal with "expeditiously." *See* 10TH TEX.APP. (WACO) LOC. R. 17(c). And heaped upon all these cases like onions on smothered liver are the motions, both routine and exceptional, that must be resolved.

And while we endeavor to stay focused on the disposition of cases, there are the constant distractions of dealing with administrative issues: budgets, personnel, supplies, equipment, file storage, facilities, and the thousand other little things judges are required to deal with.

One last thing. We are elected public officials. As such, we have mandatory reporting and filing requirements. Also there is an ever-present recognition that we are responsible to the people in our district to communicate what our responsibilities are, what decisions we have made, and how those decisions affect them. And yes, as elected judges, we must also campaign for re-election. Re-election is particularly important if you believe that stability and predictability in the law is important. I do.

But all of these work-related demands on my time have only been the indirect reasons for my delay of this opinion.

Part of the direct delay was pure hubris, pride. I did not want to admit that I was confused. I simply could not, and do not, understand the manner in which the majority reached the result that it has. I thought: How can it be that the draft opinion makes no sense to me? So I commented upon it and sought clarification. I did not receive it.

So, I thought, it is my own ignorance that keeps me from understanding what the majority has written. To overcome my ignorance, I began to read. I began by again reading the briefs and the majority opinion. I continued by reading the voluminous record—six file boxes of trial—court transcripts and exhibits sit in my office—and an untold number of cases relevant to the issues raised in this appeal.

All during this time, I was thinking—thinking about the interrelationship of the contents of the record, the issues, the law, and the result reached by the majority. I was thinking about it while I was driving, while I was mowing, and even while I sat in church.

Virtually everywhere I went, this case went with me. It burdened me. But as a result of my deliberations and research I began to organize my thoughts. Occasionally, I would have an epiphany, a flash of clarity of understanding. Issues clouded by legalese and thousands of pages of written text would suddenly break through the words and become understandable, almost tangible. The clarity would come as force-

ful and solid as the hammer of a skilled blacksmith striking white-hot steel poised on the smith's anvil.

But again hubris delayed me.

Armed with this enlightenment I was sure that I could enlighten my colleagues. I thought that I could show them the light that I had seen. It was not to be.

All is not lost. In the end, I learned patience. I was not able to convince them of what I believe to be the errors of their analysis. But I learned that you cannot rush the benefits to be obtained by careful research, time spent in careful deliberation, and being candid about why it has taken so long for the parties to get an answer to the issues presented in their case. Therefore, for my part in delaying this already slow and painstaking process—and my part has been a substantial cause of the lengthy time this case has been on appeal—I do apologize to the parties.

### THE TASK: A PLAN

The task that now lies before me is to try to communicate why I believe the majority opinion is wrong. I will note some portions of the opinion with which I agree, but in the final analysis I must, respectfully, note my disagreement with the opinion and the result it reaches.

This dissenting opinion will briefly describe the procedural background of this case. Specifically I will give a brief overview of how it got where it is—the trial, the charge, and the appeal. Discussion in greater detail of each will be reserved for discussion with the issues when necessary. I will then discuss only the most fundamental of the errors that are contained within the majority opinion. Also, I will briefly discuss the errors made by omissions from the majority opinion. Finally, in conclusion, I will endeavor to explain

what I believe is the proper result after all the necessary issues are resolved.

### Procedural Background

#### *The Trial*

The trial was about a business arrangement that went bad. Unfortunately the precise terms of the arrangement were not reduced to writing at the time it was entered into. It is not necessary for us to define or label the nature of this arrangement. While it would have been preferable for the litigants to have reduced their agreement to writing, they did not.

The general nature of the arrangement was an agreement—a contract. As indicated, the contract was not in writing. It is no surprise that, by the time of trial, the parties to the contract could not agree on what the terms had been at the beginning of their relationship, or how the terms might have been modified over time for unforeseen events and changed circumstances.

The trial was about what were the terms of the arrangement—this contract. In particular, the trial was about whether Cathey was entitled to damages because of the events surrounding only eight of the numerous ventures on which Cathey performed some services for the assistance of Meyer.

Meyer was the money man.

Cathey performed certain business-related services for Meyer. The services could generally be characterized as either of two types: as business manager or as developer.

As business manager, Cathey oversaw the management of a number of properties owned by Meyer or a Meyer-owned company. For some of the properties, I believe a fair characterization of the record would be that the ownership of the proper-

ty/company/venture was not fully known to Cathey. For these services, Cathey was paid a more-or-less fixed amount—a salary. But there was some testimony that questioned whether these payments were salary or whether they were merely intended to be draws against future earnings from the developer side of the arrangement.

As a developer, Cathey was to seek out investment opportunities for Meyer. And this is where the terms of the arrangement become very murky. The extent to which there was agreement at trial on this aspect of the arrangement is that for the developer services Cathey would be paid something. Because most of the ventures involved the purchase or creation of a legal entity—corporation, partnership, limited liability partnership, and so forth—it was not clear who would pay Cathey, the new entity or Meyer, or on what basis payments to Cathey would be calculated.

Amongst all the evidence admitted at trial that the jury, the trial court, and now this Court, sifted, the essence of the trial was the question: What was the arrangement between Cathey and Meyer regarding payment for these developer services? In a broad sense, this was what went to the jury for a decision.

### The Charge

In the charge, the jury was asked about eight specific ventures. The essence of the jury's answers was that Meyer had, through fraud, induced Cathey to enter into a written contract for four of the ventures, and to perform services on four other ventures for which Cathey was not otherwise compensated, that is, for which he was not compensated by his business-manager salary.

The jury answered in favor of Cathey as to all eight ventures and determined damages as to each.

The jury was also asked whether the evidence of harm from fraud was clear and convincing for two of the ventures. Again the jury answered in favor of Cathey. And in answer to another question, the jury determined an amount of punitive damages.

The jury also determined that Meyer had breached a fiduciary duty that he owed to Cathey. The jury determined damages as a result of the breach for two of the ventures.

But the jury's work was not finished. Meyer had defenses. Meyer contended that if he had induced Cathey by fraud, which of course he denied, Cathey had ratified or waived the fraud. Thus, Cathey would not be entitled to recover the fraud damages, actual or punitive, as determined by the jury. The jury found ratification and waiver as to all eight ventures. Arguably the jury also answered limitations questions in favor of Meyer.

After a rather extensive post-verdict motion practice, the trial court rendered judgment that Cathey take nothing from Meyer and sanctioned Cathey for discovery abuse. Cathey appealed.

### The Appeal

Because the basis of the trial court's judgment is not clear, Cathey attacked all the grounds that would support it.

### THE MAJORITY OPINION

*(The Problems with What is in it and What is not)*

After my apology and the overview of the procedural background, it is now time to turn to the majority's opinion. Again I am faced with the question—Where to begin?

There are many sections, parts, portions, and statements in the majority opin-

ion with which I do not agree. Rather than comment upon, attack, or respond to each, I will focus on the analytical issues that result in errors that, for the most part, even the most discerning reader would be unable to identify. These are issues that arise because of a flawed analysis of the record—a record not available to the reader. But it should not be inferred that I agree with anything in the majority opinion because I do not comment upon it in this dissenting opinion. It would simply serve no useful purpose for me to spend the time or the effort to address each and every disagreement.

### No Evidence of Fraud Damages?

The jury determined Cathey's damages on each of eight ventures. The charge defined the eight specific ventures. Two were referred to as projects: City Lights Project and Plaza at Turtle Creek Project. Four were referred to as contracts: Silverado Apartments Contract, Polo Club Apartments Contract, Valley Ranch Contract, and Arbors Apartments Contract. Two were referred to in relation to refinancing: Silverado Refinancing and Arbors Refinancing.

I will begin with the majority's flawed analysis of damages for fraud on the two projects. The liability question and jury's answer was as follows:

> Was Cathey induced through fraud by Meyer to provide valuable services to Meyer for which he was not otherwise compensated with respect to either of the following listed below?
>
> Fraud occurs when—
>
> a. a party makes a material misrepresentation,
>
> b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

> c. the misrepresentation is made with the intention it should be acted on by the other party, and
>
> d. the other party acts in reliance on the misrepresentation and thereby suffers injury.
>
> "Misrepresentation" means—
>
> a. a false statement of fact; or
>
> b. a promise of future performance made with an intent not to perform as promised.

**Answer "Yes" or "No" as to each project listed below:**

| | |
|---|---|
| 5a. City Lights Project | Yes |
| 5b. Plaza at Turtle Creek Project | Yes |

There was no condition upon which this question could be skipped by the jury. The damages question and jury answer was as follows:

If your answer to Questions Number 5a or 5b is "Yes," then answer the following Question. Otherwise, do not answer the following Question.

### QUESTION NUMBER 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Cathey for his damages, if any, that were proximately caused by such fraud?

Consider the following elements of damages, if any, and none other: the difference between the value as represented and the value received.

**Answer separately in dollars and cents, if any, for each of the following, if any, to which you answered "Yes" in response to Question No. 5.**

| | |
|---|---|
| 6a. City Light [sic] Project | $150,000.00 |
| 6b. Plaza at Turtle Creek Project | $750,000.00 |

The majority concludes there is some evidence to support the jury's answer to the damages question regarding the City Lights Project but no evidence to support

the jury's answer to the Plaza at Turtle Creek Project.

To understand why the majority's analysis is flawed, the focus must be on the actual wording of the question and, in particular, the related instruction. The instruction gives only one element of damages: "the difference between the value as represented and the value received."

The calculation is deceptively simple: determine the value as represented, deduct from that the value actually received, and *voilà*—the amount of damages. As a reviewing court looking for legally sufficient evidence, all we have to find is some evidence of each part of the calculation.

The easy part of the calculation is the deduction. No one contends that Cathey received anything for either of these projects. So my focus is on the first amount needed to make the calculation—the value as represented. And for my purpose, which is to illuminate the flaws in the majority's analysis, I will focus on determining the fundamental difference, or lack thereof, between the evidence of the "value represented" for the City Lights Project versus the Plaza at Turtle Creek Project. Specifically, what is the difference in the evidence that makes it some evidence as to the City Lights Project, but no evidence on the Plaza at Turtle Creek Project, as determined by the majority?

The evaluation and decision to proceed with both projects involved the use of projected cost and revenues, in the form of pro-forma financial projections, and using those projections to obtain loans to fund the projects. The preparation, including the participation of both Meyer and Cathey, and the use of the pro-forma financial projections, was explained to the jury. Those pro-forma projections were prepared by Cathey. The projections were prepared based on information provided by both and presented in a format that he

and Meyer used on the ventures. Thus the two of them were familiar with what information was included in the projections, and with the manner in which the projections were compiled and presented.

As new, additional, or more current information was received by Cathey, he would update the projections. A series of pro-forma financial projections for each project was introduced into evidence. (Plaintiff's Ex. Nos. 189 (City Lights Project), 195 (Plaza at Turtle Creek Project)). In addition to this evidence, other evidence of the value of these projects at various times and under other circumstances was admitted.

Again, the jury was asked to determine damages proximately caused by Meyer's fraud as measured by the difference in value as represented and the value received. The value received being zero, is there some evidence of "value as represented"?

To answer this question, the jury had to decide, without any direction from the court, if there had been any representation of value, and if so, what was the value represented. And subsumed within the jury's consideration was whether it mattered when the representation was made or by whom the representation was made. Because the question and instructions gave the jury no guidance on who had to make the representation or the time frame of the representation of value, the jury's only limitation was the damages proximately caused by the fraudulent representation.

So now we come to the issue we must decide: is there some evidence of damages in this record that will support the jury's implied determination that Cathey's damages, as measured by the value of the interest he did not receive, was $150,000 in the City Lights Project and $750,000 in the Plaza at Turtle Creek Project? The ma-

jority finds some evidence to support the damages on the City Lights Project but no evidence to support the damages on the Plaza at Turtle Creek Project.

The first pro-forma projection on the City Lights Project, under the section entitled "Investor Future Sale Analysis," shows a cumulative gain on sale in year 6 to be $13,095,200. Of course Cathey never contended that he was entitled to 100 percent of the value of the project. He only claimed damages as the percentage of the project that Meyer had promised him.[1] Thus, the jury could easily have determined that the amount of damages proximately caused to Cathey measured as an amount if paid now in cash, for Meyer's fraud, which the jury had already determined in response to the liability question, was $150,000. In fact, it would appear based on this analysis that anything up to $1,309,520, or possibly more, would be supported by the evidence, because Cathey had testified Meyer had promised him a 10– to 15–percent interest in the City Lights Project. Thus, I agree with the majority that there is some evidence to support a determination of value represented of at least $150,000, and thus, damages of $150,000 on the City Lights Project.

Applying the same analysis to the Plaza at Turtle Creek Project, there is some evidence of value as represented to support the jury's determination of damages. The equivalent amount, cumulative gain on sale for the Plaza at Turtle Creek Project at year 6, was $44,647,681.[2] Cathey testified that Meyer had promised him 20 percent of this project. Thus, there is some evidence that the damages proximately caused to Cathey by Meyer's fraud, as measured by Cathey's interest in the value represented less the value received could be as much as $8,929,536.20. Thus, the jury's determination of damages of $750,000 is supported by some evidence.

Even if the jury were required to discount the future value, notwithstanding that it appears from the pro-forma financial projections that the amounts have already been discounted, the jury's answers are still supported by some evidence.

And now we come to the question I asked, to which I never received a satisfactory answer: how is the evidence in support of the jury's answer to the damages question on the City Lights Project any different from the evidence on the Plaza at Turtle Creek Project?

My answer is that there is no difference. Both are supported by some evidence. Thus, the trial court erred in granting a take-nothing judgment if that judgement was based on a motion to disregard the jury's answers to these two questions because of no evidence to support damages. The majority errs in finding no evidence to support the jury's answer as to damages for the Plaza at Turtle Creek Project.

What the majority tries to sell is the theory of looking forward from the date the damages were to be measured to determine as a matter of law that there were no actual damages. The majority looks forward in time to the foreclosure on the Plaza at Turtle Creek Project to say there was no profit on the project, and thus, no

---

1. The jury would also be able to factor into the determination of Cathey's damages that, although the pro-forma financial projections prepared for both projects originally contemplated the presence of other investors, by the time the projects were developed, they were developed with no outside investors.

2. Based upon refinement of the projection and changes in the design of the overall project, the final pro-forma projection in Plaintiff's Exhibit 195 shows a cumulative gain on sale of only $22,187,504.

evidence that Cathey would have received anything. This statement is only relevant to the majority's analysis because the majority has redefined the "value as represented." *See* op. at 665. The majority contends: "The 'represented value' was that Cathey would receive a percentage of the profit, if any." *Id.*, op. at 665.

Our task on review does not include rewriting the jury charge. We review the sufficiency of the evidence in light of the charge given. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex.2000). If the restructuring of the business entity through which profits were ultimately realized is the controlling fact, as contended by the majority, the defendant would need only to defraud investors/participants, and then change the form of the entity in which the investment, and ultimately profits, are made. It would be a perverse rule of law that would allow a defendant to cut off damages by such shenanigans. I reject it, as the jury also obviously rejected it.

The majority expressly rejects the argument that the agreement "extends across time to these events." Op. at 665. But the entire case was based upon just such an agreement that by its very nature explicitly applied to future events. The majority characterizes the basic terms of the agreement in this way: "The original agreement specifically pertained to the development of the condominium project and any profit realized from it." *Id.*, op. at 665.

The trial evidence showed that there is a condominium project developed by Meyer that is profitable. The current development is nothing more than a metamorphosis of the same project into a new legal entity. The metamorphosis had the effect of cutting out the interest of another investor, someone other than Cathey. The evidence showed that the other investor had also sued Meyer for the manner in which

the foreclosure/purchase/freeze-out was accomplished.

Freezing out other investors by changing the legal entity through which the project was to be accomplished does not have the legal effect the majority desires for two reasons. First, the same type of process occurred with regard to other projects in which Meyer and Cathey were involved, including the City Lights Project. Second, the charge did not limit the jury's consideration to the legal entities as initially contemplated but defined them broadly, and thus, the jury could properly consider and reject the very evidentiary argument made by Meyer and now adopted by the majority as a fact established as a matter of law.

As to the first basis, on more than one of the Meyer Cathey ventures, the legal structure of the deal was decided long after the original agreement. Also, even after a venture was discussed the structure of the deal could, and did, change.

The City Lights Project was just one such venture. The venture as originally contemplated and developed involved another Waco family, one heavily involved in and knowledgeable about the movie theater business, the Schulmans. But as the venture progressed, Meyer was successful in removing the Schulmans from the City Lights Project. This did not change the project, it simply changed the ownership interest in the legal entity through which the venture was to be accomplished.

Likewise, Meyer's purchase at his foreclosure on his own project—remember he was and continued to be the money man for the project—which foreclosure had the legal effect of taking one of the initial investors' interest out of the venture, may have changed the legal entity through which the project was accomplished, but it did not change the fundamental nature of

the project. Nor did such a change affect the fundamental nature of the deal that Meyer had with Cathey.

And for the second reason why changing the legal entity does not achieve the majority's desired effect, we must go back to the project as defined in the charge. The project is defined in this way:

> "Plaza at Turtle Creek Project" means the acquisition and development of certain property in Dallas, Texas resulting in the construction of an apartment building referred to as "The Plaza at Turtle Creek" and related land.

Meyer did not object to the definition given.

The parties both presented extensive evidence related to Meyer's foreclosure and purchase, through a related entity, of the project. Meyer's theory was that the foreclosure not only cut out another investor, it also cut off any liability for damages that Meyer might have under his agreement with Cathey.

Cathey had presented evidence that his agreement transcended the form or mutations of the business entities through which Meyer conducted the venture, and went to the substance of each venture— his agreement, according to the evidence he presented, related to the Meyers family interest. (Ct. R. vol. 25, at 26, ll. 04–14). Given the broad definition of the "Plaza at Turtle Creek Project," and given that the jury had heard all the evidence about the foreclosure, the jury impliedly rejected Meyer's evidence and argument about what effect the foreclosure had on Cathey's damages. The majority errs in resurrecting that evidence, disregarding the express wording of the jury charge, and giving Meyer's argument and evidence conclusive effect. In effect the majority holding is not that there is no evidence of damages, but that as a matter of law the foreclosure broke the causal connection between all the evidence of damages presented by Cathey and the fraud committed by Meyer. With that holding and result I must disagree.

### No Basis for Exemplary Damages?

The majority's error in determining that there is no evidence to support the fraud damages on the Plaza at Turtle Creek Project is compounded in the next section of the majority opinion. The majority holds that because "there is no evidence of actual damages for the Dallas [Plaza at Turtle Creek] project," and because "the exemplary damages question concerned both the Waco [City Lights] and Dallas projects combined, and there was no objection or request to segregate damages," Cathey cannot recover exemplary damages for the Plaza at Turtle Creek Project "because we cannot know how the jury proportioned exemplary damages between the two projects, if it did." Op. at 666. Thus, the majority concludes, "we have no basis on which to uphold exemplary damages for Cathey or render a different amount." *Id.*, op. at 666.

The majority's holding is wrong for at least three reasons.

First, as discussed above, under a proper analysis there is evidence to support actual damages for the Plaza at Turtle Creek Project.

Second, even if there was no evidence of actual damages on the Plaza at Turtle Creek Project, as the majority notes there was no objection or request to segregate the punitive damages. Thus, Meyer has failed to show, and is unable to show, that the jury's answer on punitive damages could properly be disregarded by the trial court, if that is the basis of the trial court's judgment.

Third, even accepting the majority's rationale, this would be a proper situation in which to suggest a remittitur.

*Actual Damages*

The arguments about whether there is no evidence of actual damages for the fraud related to the Plaza at Turtle Creek Project is fully discussed above, and there is no need to repeat it. Obviously, if I am right on that issue, the majority is wrong on this issue.

*No Breakdown of Punitive Damages: No Objection to the Charge* [3]

So now we must examine what should happen if the majority is correct in concluding there is no evidence of actual damages for fraud on the Plaza at Turtle Creek Project. As the majority notes, the issue submitted was conditioned in the disjunctive, and only provided for a single answer. The question submitted was as follows:

> If your answer to Question Number 20 is "Yes," then answer the following Question. Otherwise, do not answer the following Question.
>
> **QUESTION NUMBER 21:**
>
> What sum of money, if any, if paid now in cash, should be assessed against Meyer and awarded to Cathey as exemplary damages, if any, for the conduct found in response to Question Number 20?
>
> "Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.
>
> Factors to consider in awarding exemplary damages, if any, are—
>
> a. The nature of the wrong.
> b. The character of the conduct involved.
> c. The degree of culpability of Larry Meyer.

> d. The situation and sensibilities of the parties concerned.
> e. The extent to which such conduct offends a public sense of justice and propriety.

> **Answer in dollars and cents, if any.**
> **ANSWER: $2,250,000.00**

The conditional language related to the question on whether the evidence was clear and convincing that the harm to Cathey by Meyer resulted from fraud. Question 20 called for a single answer and was conditioned on a "Yes" answer to either Question 5a or 5b that are quoted above.

And as the majority notes, no objection or request to segregate punitive damages based on the conduct the jury found in 5a versus the conduct the jury had found in 5b was made. The majority erroneously puts the burden to object to the charge on Cathey. But at trial it was Meyer who had the complaint about the answer, so it was Meyer's burden to object and show the trial court why it could not use that question and answer on which to base its judgment. *Green Intl., Inc. v. Solis,* 951 S.W.2d 384, 389–390 (Tex.1997) ("Under these circumstances [where 'neither party objected to the failure to segregate'], a trial court may disregard the jury finding only if it is unsupported by the evidence or it is immaterial.").

On appeal, Cathey's burden is only to show that the trial court could not properly disregard the jury's answer. Just because it is Cathey's issue on appeal, does not mean that he had the burden at trial to object to the issue as submitted.

Could the trial court properly disregard the jury's answer without an objection? No.

---

**3.** This is the most obvious of the legal errors in the majority analysis. As indicated earlier, most of the other errors concern record-intensive investigation and analysis.

The Texas Supreme Court has recently clarified this area of the law. The most relevant cases are *Thomas v. Oldham, Crown Life Insurance Co. v. Casteel,* and *Harris County v. Smith. Harris County v. Smith,* 96 S.W.3d 230 (Tex.2002); *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000); *Thomas v. Oldham,* 895 S.W.2d 352 (Tex.1995).

In *Thomas,* the Supreme Court held that if the party against whom a broad-form damage question is submitted does not object to it, the reviewing court must review the legal sufficiency of the evidence supporting the whole verdict. *Thomas,* 895 S.W.2d at 352. In that case, a broad-form damage question asked the jury to consider five separate elements in arriving at a single damage amount. The defendant did not object to the broad-form submission. In reaching its verdict, the jury made notations in the margin next to each of the five elements of damage. These notations totaled $500,000, which was the amount of the verdict. On appeal, the defendant challenged the verdict, arguing that there was no evidence to support the amounts noted by the jury on two of the five elements. The Court rejected the argument, observing that the jury's margin notations were not in legal effect "separate damage awards for purposes of evidentiary review." *Thomas* at 359. The Court further said that because the defendant had not asked for separate damage findings, it could only challenge the legal sufficiency of the evidence supporting the whole verdict. *Id.* at 360. Because the defendant did not make this argument, the Court rejected its evidentiary challenge. *Id.*

In *Casteel,* the Supreme Court ruled that when a single broad-form liability question commingles valid and invalid liability grounds and the appellant's objection is timely and specific, the error is harmful and a new trial is required when the appel-

late court cannot determine whether the jury based its verdict on an invalid theory. *Casteel,* 22 S.W.3d 378. The court of appeals had concluded in the case that the trial court's submission, although error, was harmless because one or more of the valid liability theories were supported by sufficient evidence. *Casteel v. Crown Life Ins. Co.,* 3 S.W.3d 582, 594–95 (Tex.App.-Austin 1997), *rev'd,* 22 S.W.3d 378. The Court disagreed, concluding that the error was harmful because the erroneous submission, over timely objection, affirmatively prevented the appellant from isolating the error and presenting its case on appeal. The Court held that:

> [W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory. *See* Tex.R.App. P. 61.1 ("No judgment may be reversed on appeal ... unless the Supreme Court concludes that the error complained of ... probably prevented the petitioner from properly presenting the case to the appellate courts."); *see also* Tex.R.App. P. 44.1(a).

*Casteel,* 22 S.W.3d at 388 (ellipses in orig.).

In *Harris County,* the most recent case in this trilogy, the court of appeals had concluded that *Casteel* applied only to "key issues" such as the submission of an invalid liability theory. *Harris County v. Smith,* 66 S.W.3d 326, 334 (Tex.App.-Houston [1st Dist.] 2001), *rev'd,* 96 S.W.3d 230. It concluded that *Casteel* did not extend to damages because, according to the court of appeals, a jury was less likely to include an invalid element of damages in its verdict than it was to rely on an invalid theory of liability. *Id.* at 334–35; *see also* William V. Dorsaneo, III, *Broad Form Submission*

of *Jury Questions and the Standard of Review,* 46 SMU L.Rev. 601, 630 (1992) (suggesting that it is reasonable to presume that the jury will notice when there is no evidence to support an element of damage, but will not know that a liability theory is invalid). The court of appeals then concluded that the erroneous inclusion of an invalid element of damages was harmless, even when identified by timely objection, so long as there was sufficient evidence of other elements in the broad-form question on which the jury could have reached its verdict. *Harris County,* 66 S.W.3d at 336–38.

Harris County argued that *Casteel*'s harmful-error analysis is not confined to questions of liability. Harris County contended that a trial court's error in instructing a jury to consider erroneous matters, whether an invalid liability theory or an unsupported element of damages, prevents the appellant from demonstrating the consequences of the error on appeal. Harris County directed the Court's attention to two courts of appeals' decisions that had applied *Casteel*'s reasoning to broad-form damage questions. *Harris County,* 96 S.W.3d at 233; *see Wal-Mart Stores, Inc. v. Redding,* 56 S.W.3d 141, 154–55 (Tex. App.-Houston [14th Dist.] 2001, pet. denied) (harmful error to submit over timely objection a broad-form damages question that mixes valid and invalid measures of damages); *Iron Mt. Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.,* 42 S.W.3d 149, 157 (Tex.App.-Amarillo 2000, no pet.) (same); *see also In re J.M.M.,* 80 S.W.3d 232, 248 n. 6 (Tex.App.-Fort Worth 2002, pet. denied) (not reaching the issue of whether *Casteel* applies to broad-form damages, but recognizing conflict in courts of appeals).

The Court resolved the conflict and concluded that

the trial court erred in overruling Harris County's timely and specific objection to the charge, which mixed valid and invalid elements of damages in a single broad-form submission, and that such error was harmful because it prevented the appellate court from determining "whether the jury based its verdict on an improperly submitted invalid" element of damage. *Casteel,* 22 S.W.3d at 388; *see also* Tex.R.App. P. 61.1(b).

*Harris County,* 96 S.W.3d at 234.

*Casteel* and *Harris County* would obviously apply to this case if there had been an objection to the charge. There was not. Thus, whereas *Harris County* was more like *Casteel,* this case is more like *Thomas* because there was no objection or request for separate damage findings. Accordingly, Meyer, in his post-verdict motion, could only challenge the legal sufficiency of the evidence supporting the whole verdict.

Thus, even if the majority is correct in holding that there is no evidence of actual damages for the Plaza at Turtle Creek Project, the majority nonetheless errs by failing to conduct a legal-sufficiency review of the whole verdict for punitive damages in relation to the record and actual damages found by the jury and affirmed by the majority for the City Lights Project, and upon which the jury could therefore have based a punitive-damages finding. In other words: will the actual damages on the City Lights Project support a punitive-damages award in the amount determined by the jury? If it will, there is no need for the majority to engage in this cumbersome process of a partial remand.

### Majority's Omissions: Remittitur and Punitive Damages Cap

Finally, as to the punitive damages for fraud, and given the majority's existing holding or a holding under a proper analysis of *Thomas* that the punitive damages in relation to the actual damages for the City

Lights Project will not support the jury's verdict, the proper remedy would be first to suggest a remittitur, not a reversal and remand for a new trial to again determine liability, damages, and punitive damages for the fraud in connection with the City Lights Project. Tex.R.App. P. 46.3. This is particularly apropos in this situation, where the jury exceeded the damages cap, even including the finding of actual damages for fraud on the Plaza at Turtle Creek Project. See Tex. Civ. Prac. & Rem. Code Ann. §§ 41.001–41.013 (Vernon 1997 & Supp.2003). Under the statutory cap on punitive damages, the judgment for punitive damages is limited to two times the economic damages determined by the jury. Id. § 41.008(b)(1)(A) (Vernon Supp.2003)

I contend, however, that the proper analysis, even if there is no evidence of damages on the Plaza at Turtle Creek Project as the majority determined, and even if Meyer did not have to object to the broad-form jury question, is to evaluate whether the evidence is sufficient to award punitive damages as capped in relation to the damages the jury determined for the City Lights Project, $150,000. Because of the statutory cap, this would be $300,000 of punitive damages. And there is more than enough evidence to support a punitive-damages award in this amount. Alternatively, by use of a remittitur, we should at least offer the parties the opportunity to engage in some savings of judicial resources.

### No Evidence of Damages for a Breach of Fiduciary Duty?

In the next section of the opinion, "Breach of Fiduciary Duty Claim," the majority makes yet another substantive analytical error in determining whether there is evidence of damages for breach of fiduciary duty by Meyer owed to Cathey. As you will recall, the majority determined that because the property was foreclosed

upon, notwithstanding that another entity controlled by Meyer purchased the property at foreclosure, there was no profit and thus, no damages. The majority then decides that because there was no "represented value" damages, for the same reason there is also no evidence of damages under the breach-of-fiduciary-duty damages theory on the Plaza at Turtle Creek Project. Balderdash.

The elements of damages are entirely different for these two substantially different theories, as well they should be. The most critical distinction, however, may not lie with the elements of damages, but with the jury's ability to consider the events and actions of Meyer in connection with the foreclosure. For it is the very manner of Cathey's discharge and the subsequent foreclosure on which the jury could base its determination that Meyer breached the fiduciary duty he owed to Cathey.

No useful purpose would be served by a detailed review of all the evidence about the manner in which Meyer conducted his business ventures. But during the trial the jury heard about several business ventures besides the eight at issue in the charge. Cathey's evidence presented an unflattering picture of the manner in which Meyer conducted business.

One practice that Cathey's evidence was intended to highlight was the manner in which Meyer would attract other businesspeople to participate at some level in a venture. And at a later date, if the venture appeared to be profitable, he would take action to freeze out the interest of a minority investor. Alternatively, if for some reason Meyer decided he was no longer interested in the venture, he would take action that would force the other investors to buy out Meyer's interest in the venture to protect the value of their investment.

With this evidence of what Cathey presented as a pattern of the manner in which Meyer routinely conducted business, the jury's implied determination that the foreclosure on the Plaza at Turtle Creek Project was just such a transaction is well supported. And further, because the jury had determined that Meyer had a confidential relationship with Cathey, the jury could properly have decided that the purchase at foreclosure by a Meyer-owned company did not affect the damages Cathey had proven were caused by Meyer's breach of fiduciary duty owed to Cathey.

And we must also remember there was evidence that Cathey's interest was to be a percentage of the Meyer family's interest, essentially in whatever form that interest might mutate.[4]

Lastly, lest we forget, there is the proforma financial information showing the projections and expectations of Cathey and Meyer when embarking upon this particular venture. (Plaintiff's Ex. 195). This exhibit alone, when considered in the context of the elements of damages that the jury was instructed to consider, provides all the evidence needed to support fully the jury's determination of damages. The jury instruction and question on damages as a result of the breach of the fiduciary duty were as follows:

If your answer to Question Number 10a or 10b [regarding the determination of a failure to comply with a fiduciary duty owed to Cathey by Meyer] is "Yes," then answer the following Question. Otherwise, do not answer the following Question.

*QUESTION NUMBER 11:*

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Cathey for his damages, if any, that were proximately caused by such breach of fiduciary duty in the City Lights Project and/or Plaza at Turtle Creek Project?

Consider the following elements of damages, if any, and none other: the value of any property, income, or business interests lost as a natural, probable, and foreseeable consequence of Meyer's breach of fiduciary duty.

**Answer separately in dollars and cents, if any, for each of the following, if any, to which you answered "Yes" in response to Question Number 10.**

11a. City Lights Project $150,000.00

11b. Plaza at Turtle Creek Project $750,000.00

This instruction gave the jury wide latitude to consider all the evidence of damages for the breach of the fiduciary relationship that the jury had determined to exist.

There are two further reasons why the majority's use of the foreclosure as a basis to conclude that there is no evidence of damages for breach of fiduciary duty is erroneous. First, the jury must be allowed some latitude in determining damages under these circumstances. The foreclosure did not happen until two years after Cathey was discharged and after this suit was filed. Especially in light of the evidence discussed above, the jury could have determined that the project's economic crisis that led to the foreclosure resulted from events that Meyer caused after he had breached the fiduciary duty owed to Cathey. We should not limit Cathey's damages based on Meyer's conduct after the breach.

A second but related reason why the majority analysis is erroneous is that this type of damage evidence is never precise. Subsequent events may provide some evidence of what the damages are, but sel-

4. See note 1.

dom, if ever, could subsequent events conclusively establish there were no damages at all.

In this case, Cathey put into evidence two points of view from which the jury could measure his damages. He put into evidence what he expected at the date of the breach, looking forward to what was expected. This was in the form of the pro-forma financial projections. He also put into evidence actual events as they developed. The evidence of the events that actually occurred shows that while the projections may have been inaccurate, the project, as defined in the charge, was a profitable project—profit of which Cathey was deprived by Meyer's breach of fiduciary duty.

The jury was fully within its province to take all this evidence, both the financial projections, which certainly were evidence of Cathey's expectations, as well as actual data as it developed, and after weighing all this and the other evidence of the success and value of the projects, to determine Cathey's damages.

And a final note about the effect of the foreclosure: the jury could easily have determined that Cathey's interest should have been, and but for the breach of the fiduciary duty would have been, protected as part of the foreclosure process. Certainly if Cathey had continued to work for Meyer, Meyer would have been obligated to protect Cathey's interest in the project because of the fiduciary relationship that existed between them. Again I say, Meyer should not be allowed to use events that he controlled that took place after the breach of the fiduciary duty to limit Cathey's damages.

Thus, I agree that there is evidence to support the finding that Meyer owed Cathey a fiduciary duty. I also agree that there is evidence to support the jury's damage award as to the City Lights Project. I disagree, however, with the majority's conclusion that there is no evidence to support the jury's determination of damages resulting from the breach of the duty for the Plaza at Turtle Creek Project.

### No Evidence of Ratification or Waiver?

We must now turn our attention to the defenses that the jury found in favor of Meyer. Specifically we must address the tension between the jury's finding of fraud by Meyer on the one hand and a finding of ratification and waiver of that fraud by Cathey on the other.[5]

The tension to which I refer is caused by the question related to fraud, as defined in the charge, as compared to the questions regarding ratification and waiver, also as defined in the charge. Specifically the tension relates to timing. It relates to the timing of the conduct of Meyer found to constitute fraud and the conduct of Cathey found to constitute ratification or waiver. As the majority notes, Cathey's conduct before the fraud cannot constitute ratification or waiver of the fraud.

So the easiest way to address this issue is first to line up the events chronologically. The jury has, for the most part, determined what critical events occurred. Cathey should recover for each event that resulted in damages as a result of Meyer's fraud if the event occurred before Cathey became aware of the fraud or breach. But the chronology may not be as simple as it seems, because the jury did not determine a date certain on which Cathey became

---

**5.** The jury refused to find that Cathey was barred from pursuing his claims due to laches.

aware of the fraud or breach as to any particular venture.

The events occurred in the following order:

1. 1992—Meyer and Cathey team up.
2. 1993—Silverado Apartments venture.
3. 1993—Polo Club Apartments venture.
4. 1995—Valley Ranch Apartments venture.
5. 1995—Arbors Apartments venture.
6. 1995—Refinancing of the Silverado Apartments.
7. 1995—Refinancing of the Arbors Apartments.
8. 1995—City Lights Project venture.
9. 1996—Plaza at Turtle Creek Project venture.
10. 1996—Meyer and Cathey cease working together. August 13, 1996, is the date the jury determined the fiduciary relationship ended.

And this now brings us to the most critical question, the question on which the ultimate result in this case turns: What was the conduct that the jury found to be fraudulent as to each of the events summarized above in items 2 through 9? For it is only the conduct that the jury found to constitute fraud that is the subject of the questions regarding ratification and waiver.

This brings us to a fundamental problem that I refer to as dancing with two theories. Cathey went to trial—the dance. Cathey presented two different views of the events, his version of what the evidence established, under which he believed he was entitled to recover—two theories. Thus, he was dancing with two theories in front of the jury. This is dangerous, because as the charge was structured the jury was allowed to decide which theory, if either or both, was what actually happened. But we are not able to tell which theory the jury decided upon. Let me explain.

The first theory of the evidence is that there was a global agreement between Cathey and Meyer regarding the developer activities. Under this theory of the evidence, the jury was presented evidence upon which they could determine that Cathey was entitled to a 20–percent ownership of any venture that Cathey brought to Meyer, 10–percent ownership of any venture that Meyer discovered but on which Cathey performed services, and a $25,000 bonus for each completed refinancing. But lest I summarize the two major provisions of the alleged agreement incorrectly, let Cathey tell you in his own words what the essence of the "global agreement" was:

Q. Mr. Cathey, did you and Larry Meyer have a discussion as to how you would be compensated on real estate purchases that you-all might make as you continued together?

A. Yes, sir.

Q. And tell us what that discussion was, please.

A. That discussion was regarding Silverado and at the beginning of acquiring real estate assets, and Larry said I would receive 20 percent on those projects which I found and 10 percent which he found or that were Meyer-family related, that came in through Larry's efforts.

(Ct. R. vol. 23, at 47, l. 15–48, l. 2).

And I think it helpful to see how Cathey applies his understanding of the "global agreement" to an individual venture.

Q. Now, I take it from what you say—And you have sued in this lawsuit saying that you're entitled to 20 percent

of something related to The Plaza at Turtle Creek; is that correct?

A. Yes, sir.

Q. You're not suing here for 10 percent or five percent or any different number. You're suing for 20 percent; is that correct?

A. Yes, Sir.

Q. And you say that the reason you should get that is because of a verbal contract that you say was made before January 18 of 1993 between you and Larry Meyer; is that correct?

A. Yeah. And reinforced all the way through, yes, sir.

Q. Well, you say the contract was made back there in early January of 1993; is that correct?

A. Yes, sir.

Q. Now, The Plaza came up as an opportunity in the middle of 1995; is that correct?

A. Yes, sir.

Q. And you say that you found that [property for the Plaza at Turtle Creek Project]; is that right?

A Yes, sir.

(Ct. R. vol. 31, at 135, l. 12–136, l. 10).

Under this theory, there was a "global agreement," and each of the contracts on the individual ventures would effectively be the payments, the compensation due, to fulfill the "global agreement."

The second theory of the evidence is that there was a series of agreements, each resulting in a separate and independent contract. Under this theory of the evidence, each separate venture, while arising in its inception out of the relationship between Cathey and Meyer, would be documented as individual contracts. Under this theory of the evidence, Cathey sought to explain why each and every individual contract deviated from the "global agreement." I hope that the reader will forgive the length of the following excerpt, but it exemplifies just a small fraction of the conflicting testimony the jury heard during this six-week trial.

Q. Let's look at Defendant's Exhibit 252. Do you have that?

A. Yes, sir.

Q. All right. Mr. Richardson asked some questions about this. I want to ask you first of all: You prepared this, didn't you?

A. Yes, sir.

Q. And this says, "John Cathey ownership," doesn't it?

A. Yes, sir.

Q. Other than—How many are there on here? Three, six. There are 14 different projects; is that correct?

A. Yes, sir.

Q. The only one under there that has the percentage that would be called for under the global agreement that you have told us about is Silverado; isn't that correct?

A. That's—Yes, sir.

Q. And so, if we go down these—For example, Polo Club. If there had been a global agreement that had been applied, that would have been 10 percent, right?

A Yes, sir. But the—that agreement had already been written.

Q. Well, sir, I'm asking you: If we just took the global agreement that you say existed, that you were—going to make you a partner and everything, let's see how it applies to the list that you prepared. Polo Club should be 10 percent, right?

A. But the agreement had already been written, but it should have been—

Q. Sir—

A. —and was originally 10 percent.

Q. Sir, in each of these instances, unless I tell you differently, I'm asking you to simply take your verbal global agreement that you say, and let's apply it to these projects, and see what percentage would have been had that applied. Okay?

A. Okay.

Q. Polo would have been 10 percent, right? Not five and a half, right?

A. Yes, sir.

Q. Burnett Field would have been 20 percent and not 10 percent; is that right?

A. Well see, again, Larry and I already had a deal on Burnett Field and Site 6.

Q. Sir, first of all I'm just asking you to apply the global agreement and see how the percentages would have been different. Isn't it true that under the global agreement, Burnett Field would have been 20 percent?

A. No, sir, because that was a casino site.

Q. Oh. So, when you said that the global agreement was for everything that Larry Meyer did back there in early 1993, did you have an agreement that it wouldn't include casino opportunities?

A. Not the original agreement. We later came back and said it would not apply to casinos.

Q. And, in fact, as you were describing these for Mr. Richardson ... correct me if I'm wrong ... you said, "Well, the deal wouldn't apply to Polo, because we changed it and I agreed to change it."

The deal wouldn't apply to Burnett Field and Site 6 because that was a different kind of property.

It wouldn't apply to Kemah because I had a different percentage there or Dallas–Harrah's or any of the other Harrah's.

Olympian, it wouldn't apply on my 20 percent, because I was trying—we were changing it to try to catch up, and so I put in 25 percent.

Dyson Apartments, you put in 20 percent there; is that correct?

A. Yes, sir.

Q. That never happened, did it?

A. No, sir. That never closed.

Q. JLM profit pool, one percent. And FM Properties three percent. And I believe you said that was three percent rather than 10 or 20 because the properties were so big?

A. Yes, sir.

Q. And also that there were outside partners that were going to be involved?

A. Yes, sir.

Q. Of course, there were outside partners that were going to be involved?

A. Yes, sir.

Q. Of course, there were outside partners involved in The Plaza at Turtle Creek, correct?

A. There was.

Q. And there were outside partners involved in City Lights, correct?

A. Yes, sir.

Q. And in VR27; is that right?

A. Yes, sir.

Q. And The Plaza at Turtle Creek was a big project, correct?

A. Yes, sir.

Q. So, The Plaza at Turtle Creek had the two characteristics that you say caused FM Properties to be a smaller percentage that would have been under the global agreement, correct?

A. Yeah. But this applies right here—the three percent is applying to the total deal right there.

Q. Well, sir, in fact, on Plaza, weren't you still negotiating what the per-

centage would be as late as just a few days before your business relationship concluded?

A. "Negotiating".

Q. Didn't we see a document—

A. Yes, sir.

Q. —just before lunch where you said, "How about five to seven percent on The Plaza?"

A. Yes, sir.

Q. Didn't we just see that a little while ago?

A. Yes, sir.

Q. You were still negotiating as of July of 1996 with Larry Meyer on what percentage you might get in The Plaza, weren't you?

A. Yeah, five to seven percent of his total ownership of the 64. I was trying at that time to—when nothing was negotiable, I was trying to salvage something from that, yes, sir.

Q. But my question is: In July of 1996, you were negotiating with Larry Meyer. You were seeking five to seven percent on The Plaza project, weren't you?

A. What was the date?

Q. In July of 1996.

A. Yes, sir.

Q. And then going down, you put Arbors 15 percent. Of course, under the master agreement, you would get 10 percent; is that correct?

A. Yes, sir.

Q. And Austin Travis County, you put in 15 percent, right?

A. Yes, sir.

Q. And that's not a percentage you would have gotten under the master agreement, is it?

A. No, sir. May I explain The Arbors percentage?

((sic) Ct. R. vol. 37, at 30, l. 14–36, l. 2). Whereupon the testimony went off in another direction.

Of course this second theory presented a practical problem for Cathey. First, without the "global agreement," he had no agreement, written or verbal, on the two largest, most lucrative projects—City Lights Project and Plaza at Turtle Creek Project. Nor would he have a contract on the compensation that he alleged he was due for refinancing.

So what was the jury to do? As every jury is asked to do—resolve the conflict. And this was a conflict of theories of evidence, not a conflict of legal theories. The legal theory was singular: fraudulent inducement. The jury was asked to determine if Meyer had fraudulently induced Cathey. The jury was then asked if Cathey had ratified or waived "the conduct of Meyer, if any, that [the jury] found constituted fraud." Only the jury knows what conduct it had found constituted fraud.

So what are we to do? We must determine whether there was evidence of ratification or waiver of any theory of fraud presented by Cathey. Where the majority errs in its analysis is that it has decided that the fraud the jury found was directly related to the contracts on the individual ventures, and not based upon the possibility that the fraud found by the jury was the conduct by which Meyer induced Cathey to enter into the original relationship with Meyer—the inducement to enter into the "global agreement."

· The majority's myopic view of the allegations and evidence of fraud, and thus, of the actions of Cathey that would constitute ratification or waiver, prevent it from seeing the big picture that the jury could see. And more importantly, it is the big picture of Meyer's conduct that the jury could determine was fraudulent, and Cathey's conduct that the jury could determine was

ratification and waiver, that we must review.

And Cathey knew from the very first venture that Meyer had breached the agreement that Cathey alleged existed between them, the "global agreement." Cathey's testimony relating to the first consummated real-estate deal is as follows:

Q. . . . Now let's go back, Mr. Cathey, and—just briefly. After the agreement with the—Well first, when you got the Silverado agreement and it showed a 20–percent distribution, was that what you and Larry Meyer had talked about?

A. No, sir.

. . . .

Q. . . . What did you and Larry Meyer talk about?

A. We talked about a 20–percent ownership of the Silverado.

Q. Okay. And what was the reason Larry Meyer gave you as to why you were getting a distribution interest instead of an ownership interest?

A. He needed the distribution structure set up because of his personal tax requirements. And he needed the full tax deductions from being, you know, the 100–percent owner.

Q. Did Mr. Meyer ever ask you if that was okay with you?

A. No, sir.

(Ct. R. vol. 36, at 102, l. 13–103, l. 14).

And the jury was not asked just about awareness of the fraud, which is all the majority addresses. By way of the definitions of ratification and waiver, the jury was also asked about awareness of a "breach" of the agreement that the jury found to have been induced by fraud, in both the question related to ratification and the question related to waiver. The testimony quoted is certainly some evidence that Cathey knew of a breach of the "global agreement" prior to signing the Silverado distribution agreement.

So when I review the same six weeks of evidence that the jury reviewed, and ask myself the question, "Is there some evidence that Cathey was aware that Meyer breached the 'global agreement'?", my answer is, "Yes." Cathey testified that as to their very first venture he did not receive what he thought he was entitled to. Thus, he expressly agreed to accept less than what he thought himself entitled to when he signed the very first written contract on an individual venture, the Silverado Apartments Contract. That was all that the jury needed to hear to be able to answer the questions on ratification and waiver in the affirmative. But the jury heard much more than just the brief excerpt of Cathey's testimony above. The jury's "yes" answer is supported by legally sufficient evidence. Accordingly, the trial court was correct if its judgment that Cathey take nothing from Meyer on the fraud claim was rendered on the basis that Meyer had established the defenses of ratification and waiver.

This analysis of the evidence also reflects why the majority's analysis of *Fortune Production Co.* is flawed. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex.2000). The majority construes this case as being like that of Fortune and Tucker, the gas producers in *Fortune* who had agreements with Conoco to sell their gas at a fixed price. Fortune and Tucker had an existing contract that required them to deliver their production to Conoco, and they continued to operate under that agreement. Unlike these producers, Cathey did not have a continuing obligation to work for Meyer. Cathey could have walked away from his arrangement with Meyer at any time with no continuing obligation to provide services of any kind to Meyer. In this sense, Cathey's arrange-

ment was like that of employment at will, in which the employee can leave at any time. *See Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604 (Tex.2002) (discussing employment-at-will relationship). Thus, Cathey's relationship with Meyer was more like that of Cox and Hankamer, the producers in *Fortune* who did not have a written contract to provide gas to Conoco. In *Fortune,* the Court held that because Cox and Hankamer did not have a continuing obligation to sell their gas to Conoco, but continued to do so after they knew of the fraud, they had ratified the fraud, and were therefore not entitled to any recovery. *Fortune* at 679–80. Likewise, Cathey should be barred from any recovery, because after he was aware of the breach, which by the definitions in the charge would constitute ratification and waiver of the fraud, he continued to work for Meyer although he was not obligated to continue to perform those services. The jury could have viewed the evidence of Cathey's acceptance of what Meyer was willing to pay for his services in either of two ways: (1) that Cathey was ratifying the fraud that induced him into the relationship; or (2) that Cathey was waiving that fraud, thus, putting his confidence in Meyer, and relying on Meyer to treat him fairly with regard to the compensation paid on each venture.

### No Discovery Abuse to Support a Post Trial Award of Sanctions?

The majority also errs in sustaining Cathey's sixth issue, concerning the trial court's imposition of sanctions for Cathey's false responses to discovery requests. This is an unusual case in which Cathey, during discovery, falsely answered interrogatories, falsely denied requests for admission, and falsely testified at depositions; then, at trial, recanted, testified truthfully, and admitted that he had lied. Under these extraordinary circumstances, the trial court did not abuse its discretion

in imposing monetary sanctions for Cathey's perjury, which took place during discovery, but did not become manifest until Cathey testified at trial. The majority relies on cases cited by Cathey, and his interpretation of those cases, which do not apply under the circumstances of the instant case. *See Remington Arms Co. v. Caldwell,* 850 S.W.2d 167 (Tex.1993) (orig.proceeding).

The discovery sanctions concern Cathey's resume, which he offered into evidence at trial. In Meyer's motion for sanctions, he alleged several particulars in which Cathey's resume was false: (1) that Cathey had been executive vice president of a computer company, and had completed a large contract for that company; (2) that he had owned a television station, and had nationally syndicated two television programs; and (3) that he held university degrees and other academic honors. During discovery, by Cathey's answers to interrogatories, responses to requests for admission, and deposition testimony, Cathey had maintained the truth of these statements in his resume. During discovery, Meyer obtained deposition testimony that tended to contradict these statements, one witness for each matter except concerning Cathey's academic record, for which Meyer deposed two witnesses. At trial, Cathey admitted that he had lied. Most clearly, when confronted with the matter of never having been an employee, much less an officer, of the computer company, Cathey testified, "That's come to my attention. I was a consultant...."

The majority emphasizes the general rule, that "the failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct." Op. at 672 (quoting *Remington Arms,* 850 S.W.2d at 170). This

rule serves a beneficial purpose: "By requiring a pretrial ruling on existing pretrial disputes, the parties are better able to organize and present their cases without surprise." *Finlay v. Olive*, 77 S.W.3d 520, 526 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

But as well established as this rule is the exception: "[i]f pretrial discovery abuse is not revealed until after the trial has begun, or even after trial, a party cannot be said to have waived a claim for sanctions." *Remington Arms*, 850 S.W.2d at 170; *see F & H Invs., Inc. v. State*, 55 S.W.3d 663, 671–72 (Tex.App.-Waco 2001, no pet.). "[N]othing in the *Remington* opinion can be read to apply to a situation where the failure to properly comply with discovery was not discovered prior to the commencement of the trial." *City of Dallas v. Ormsby*, 904 S.W.2d 707, 711 (Tex.App.-Amarillo 1995, writ denied) (op. on orig. submission).

The majority believes that Meyer should have moved for sanctions pretrial. The majority states that Meyer had "a reasonable evidentiary basis on which to base a pre-trial motion for discovery sanctions." Op. at 673. This holding flies in the face of the trial court's findings of fact, to which we must give deference. *See IKB Indus. v. Pro–Line Corp.*, 938 S.W.2d 440, 442 (Tex.1997). The trial judge, a visiting judge who presided over trial and over the sanctions hearing, stated that neither he nor the elected judge of the court, who presided over discovery in the case, would have ruled on the basis of the evidence available before trial that Cathey's pretrial statements were perjured. Indeed, at the sanctions hearing, Cathey maintained that even at trial the matters in Meyer's motion were still hotly contested.

The imposition of sanctions is in the court's discretion. *Walker v. Gutierrez*, 46 Tex. Sup.Ct. J. 812, 815, 111 S.W.3d 56,

61–62, 2002 WL 32116846, at *4 (June 19, 2003); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.2001). "The test for abuse of discretion is 'whether the court acted without reference to any guiding rules or principles,' or, stated another way, whether its decision was arbitrary or unreasonable." *City of San Benito v. Rio Grande Valley Gas Co.*, 46 Tex. Sup.Ct. J. 861, ——, 109 S.W.3d 750, 756–57, 2003 WL 21468760, at *5 (June 26, 2003) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex.1985)). Matters of degree are especially suited to the exercise of discretion. *See TCI Cablevision of Dallas, Inc. v. Owens*, 8 S.W.3d 837, 847 (Tex. App.-Beaumont 2000, pet. dism'd by agreement) (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 416 (5th Cir.1998)).

The trial court did not abuse its discretion in holding that Meyer's sanctions motion was timely. In short, the trial judge awarded sanctions because he did not believe that a party should be insulated from sanctions for perjurious conduct merely by keeping the issue contested until the beginning of trial. As the judge noted, under the interpretation of *Remington Arms* advanced by Cathey, so long as a discovery abuser could maintain plausible deniability throughout the discovery period, there would be no effective discovery sanction for perjury in discovery. Once, as here, the presiding judge observes the discovery abuse move from murkiness to clarity, the judge, in the exercise of discretion, must have the power to sanction it.

Indeed, one of the reasons for which the trial court awarded sanctions was Cathey's slipperiness. At the sanctions hearing, the trial court said of Cathey, "I agree that this was the most evasive witness I think I have ever listened to, and he—used more language to keep from asking [sic] a question than any person I have ever met." The court noted that Meyer had, in the court's

words, only a "clue" that Cathey's discovery responses were subject to attack, but not enough evidence to support a pretrial motion for sanctions. The trial court deemed it particularly significant that Cathey never withdrew, amended, or supplemented his perjured responses to requests for admissions, answers to interrogatories, or deposition testimony, prior to trial.

In this connection, the case cited by Cathey is distinguishable. *See Songer v. Clement,* 20 S.W.3d 188 (Tex.App.-Texarkana 2000, no pet.). In *Songer,* the plaintiffs alleged that the defendant's sand mining operations caused their lung disease. *Id.* at 189–90. Among the evidence that came to light during discovery, and which was known to both parties at that time, was recent video recordings of the plaintiffs smoking cigarettes, and recent statements to their physicians that they smoked between one and a half and two packs of cigarettes a day. *Id.* at 190, 192. In deposition, nonetheless, the plaintiffs testified that they had not smoked significantly since at least 1990. *Id.* at 190. At trial, after the plaintiffs testified in accordance with their deposition testimony, the defendant introduced the video recording and medical records, and moved for death-penalty discovery sanctions. *Id.* at 190–91. The court of appeals held that the defendant waived its motion for sanctions by waiting until trial before moving for sanctions. *Id.* at 193. *Songer,* in which the video evidence and the plaintiffs' own admissions in medical records clearly established perjury, is clearly distinguishable from the instant case, in which, in Meyer's words, the pretrial evidence only created a "swearing match" between Cathey and another witness.

Both *Remington Arms* and the cases applying its general rule concern typical discovery disputes, such as the untimely production or failure to produce documents in response to discovery requests. *See Remington Arms,* 850 S.W.2d at 169 n. 4. Perjury, however, is not a typical "discovery dispute." The discovery disputes contemplated by Rule 215 concern the failure to respond to discovery requests or orders. *See, e.g.,* Tex.R. Civ. P. 215.2(b)(2) (failure to appear for deposition or failure to answer deposition question), 215.2(b)(3) (failure to answer interrogatory) 215.4(a) (insufficient answer to request for admission). Cathey did not fail to participate in discovery; he appeared and testified at depositions, answered Meyer's interrogatories, and denied Meyer's requests for admission, but the substance of Cathey's participation was false. Thus, the rationale of *Remington Arms* does not apply.

The majority also fails to address Meyer's contention that the trial court had the authority to sanction Cathey under its inherent power. We have held that "a trial court has inherent power, subject to an abuse of discretion standard, to impose sanctions not covered by rule or statute to discipline an attorney's behavior" as well as that of a party. *See Fox v. Parker,* 98 S.W.3d 713, 728 (Tex.App.-Waco 2003, pet. stricken); *accord Kings Park Apts., Ltd., v. Nat'l Union Fire Ins. Co.,* 101 S.W.3d 525, 540–41 (Tex.App.-Houston [1st. Dist.] 2003, pet. filed); *In re N.R.C.,* 94 S.W.3d 799, 807–808 & n. 4 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). This contention bears consideration.

For these reasons, *Remington Arms* and the other cases cited by Cathey do not control in this case. The trial court was within its discretion to sanction Cathey for his perjurious conduct in discovery. Accordingly, Cathey's sixth issue should be overruled. Because the majority sustains the issue, I respectfully dissent.

## CONCLUSION

So where does this leave the jury's verdict in relation to the judgment? Cathey lost the benefit of the jury findings of fraud and damages because Meyer established the affirmative defenses of ratification and waiver. And because Cathey is not entitled to any actual damages on his fraudulent-inducement claim, Cathey is also not entitled to recover any exemplary damages from Meyer. This is consistent with the trial court's judgment. But the trial court erred in refusing to award judgment in favor of Cathey, as found by the jury, for Meyer's breach of the fiduciary duty owed Cathey with regard to the City Lights Project and the Plaza at Turtle Creek Project. And the judgment should include pre- and post-judgment interest, and costs. The trial court did not err, however, in its finding that Cathey should be sanctioned for discovery abuse.

Accordingly, I would render judgment in favor of Cathey for the breach of fiduciary duty claims determined by the jury in the amount of $900,000 ($150,000 for the City Lights Project and $750,000 for the Plaza at Turtle Creek Project), statutory interest, and costs, with an offset for the sanctions for discovery abuse as determined by the trial court in the amount of $25,978.73. Because the majority does not do so, I respectfully dissent.